582 So.2d 892 (1991)
Rolando ROBLEDO, Plaintiff-Appellee,
v.
ORR MOTORS OF LOUISIANA, INC., Defendant-Appellant.
No. 22,485-CA.
Court of Appeal of Louisiana, Second Circuit.
June 19, 1991.
*893 Wiener, Weiss, Madison & Howell by James R. Madison, Shreveport, for defendant-appellant.
Richie & Richie by Byron A. Richie, Shreveport, for plaintiff-appellee.
Before MARVIN, C.J., and NORRIS and LINDSAY, JJ.
MARVIN, Chief Judge.
A corporate auto dealership, Orr Motors, appeals a judgment awarding its former employee, Robledo, damages for breach of a six-month employment contract, and penalty wages and attorney fees under LRS 23:632 for failure to timely pay the wages due upon termination.
Orr Motors contends the trial court was clearly wrong in its conclusions that Robledo was hired as a mechanic for six months and was discharged without cause. Orr Motors claims the clear error is shown by Robledo's deposition which Orr claims the trial court erroneously ruled was inadmissible. Orr Motors also complains of the penalty wage and attorney fee awards. Robledo answered the appeal to seek additional attorney fees for work done in the trial court and on appeal.
We amend to award attorney fees for the work done at and after trial and on appeal, limiting, however, the attorney fee award to the statutory penalty wage demands.
We affirm the judgment as amended.

FACTS
Orr Motors of Louisiana, Inc., after becoming the Acura dealer in Shreveport in December 1988, hired Robledo to work as a mechanic in the service department in January 1989. Robledo was a "certified Acura mechanic" who had worked for the previous owners of the Shreveport Acura dealership. He was not working for the dealership, however, when Orr became the dealer.
The critical factual issue is whether Robledo was hired for a six-month period. Robledo began working for Orr on January 9, 1989. Apparently through January, Robledo was paid weekly, at the rate of $13.50 per "flag hour," which is the amount of time that is allocated in an industry manual to accomplish particular mechanical work. The actual time spent by a mechanic may be more or less than the allocated "flag" time.
Keith Orr, a principal in the defendant corporation, testified Robledo was initially hired on a "straight commission" basis of $13.50 per flag hour. Robledo agreed that he was to be paid $13.50 per flag hour but testified he was hired with the understanding that he would be guaranteed at least $450 per week, the amount he would earn for about 33 flag hours, even if his flag hour pay did not reach $450 per week. Robledo was apparently paid less than $450 *894 per week for his first few weeks of work, although Orr's records show that he "flagged" more than 33 hours per week.
At the end of January 1989, Robledo discussed his employment with Keith Orr. Keith Orr testified Robledo was only "concerned about his income flow" because the new dealership's customer base was not yet established. Robledo said the "discussion" he had with Keith Orr resulted in Orr "verifying that I was going to have employment for six months." During this discussion Keith Orr and Robledo signed this agreement that was handwritten by Keith Orr on corporate stationery:
Rolando Robledo's pay plan is as follows:
1. 13.50 flag hour.
2. A guarantee of 1800.00 per month.
3. Whichever is greater.
4. Effective Jan. 1, 1989. Prorated for Jan.
23 work days
Rolando started on 9th at noonthat leaves 18.5 days ... = 1447.82 [guaranteed pay for Jan.]
This pay plan is good for 6 mos., at that time it will be evaluated by both parties.
After the written agreement was signed, Orr continued paying Robledo weekly for his flag hours and paid him an additional amount at the end of the month if his "flag hour" pay for the month was less than $1,800. Robledo's "flag hour" pay was less than $1,800 for February 1989 and more than $1,800 for March 1989. He "flagged" 25.60 hours in the first week of April and was fired, according to Orr, for lack of productivity on April 13. "Productivity" is measured by the relationship between flag hours and actual hours. See discussion, infra, under Cause For Termination section of this opinion. The next day, April 14, Orr gave Robledo its check for $95.31 for nine flag hours Robledo worked from April 10-13.
Robledo's supervisor, Carl Qualls, who gave Robledo the check on April 14, testified that Robledo did not question the amount of the check. Robledo testified he "immediately" told Qualls the check was not correct and asked if there was "another check somewhere in the building that [they] needed to be getting to me for this week's work." Orr had no other check for Robledo.
On June 5, 1989, Robledo wrote to Keith Orr at the dealership:
On April 13, 1989, your company fired me from my job as mechanic. At that time, I asked to be paid the $1,800.00 monthly guarantee which we previously agreed to. I have not yet received that payment. Additionally, I feel that I am entitled to the $1,800.00 for May and for June since you did promise me continued employment. Please let me know when I can come by the dealership and pick up my checks.
Keith Orr said he did not take the letter seriously and threw it away. Robledo's attorney sent the dealership another demand letter on June 21, 1989, claiming penalty wages and attorney fees under LRS 23:631-632 for its failure to pay Robledo $342.90 as the statutes required, this amount being the difference between Robledo's flag hour pay and the pro-rata share of his guaranteed pay from April 1-13. The June 26 demand letter also asserted Robledo's demand that he was guaranteed six months of employment by the written agreement that was signed in late January. Robledo demanded $4,590 for the period April 14-June 30 under the written agreement.
On June 29, 1989, Orr mailed Robledo a check for $2,336.34, which amount was for the guaranteed pay from April 1-13 ($342.90) and for penalty wages from June 6, when it received Robledo's first demand letter, through June 29, the date of the tender ($1,993.44). Orr also offered on June 29 to pay Robledo $500 in attorney fees for legal services through June 29. Robledo did not accept this offer.
Robledo cashed the $2,336.34 check from Orr and brought suit for $4,590 on the written agreement and for about $4,400 in statutory penalty wages from April 14-June 5, plus reasonable attorney fees.
Orr contended the written agreement was merely a six-month "pay plan" and *895 was not an agreement to employ Robledo for a definite term. Orr claimed the agreement simply guaranteed the amount of monthly pay if Robledo remained employed for six months. Alternatively, Orr contended that any employment contract was justifiably terminated because of Robledo's poor job performance. On the claim for penalty wages and attorney fees, Orr argued that its underpayment of wages at the time of Robledo's termination was a "good faith" oversight because Orr had no notice of demand for Robledo's pro-rata share of the April guaranteed pay until it received Robledo's June 5 demand letter on June 6.
The trial court resolved each issue in Robledo's favor, assigning written reasons, and awarded the amounts Robledo claimed for contractual damages and penalty wages, plus about $3,100 for legal services rendered through the day before trial.
Orr moved for a "new trial limited to reargument," questioning, factually and legally, the trial court's rulings. The court denied the motion and assigned additional written reasons for judgment.
Because the crux of each of Orr's appellate arguments was made below, we discuss the trial court's ultimate findings with Orr's assignments of error, the first of which presents an evidentiary issue.

ADMISSIBILITY OF PLAINTIFF'S DEPOSITION
Orr's counsel offered Robledo's pre-trial deposition into evidence before cross-examining Robledo. Robledo's counsel objected that the deposition was irrelevant except for impeachment purposes, explaining that Robledo was available for cross-examination and arguing that the deposition was not admissible for impeachment purposes at that juncture because no foundation for impeachment had been laid or undertaken.
After the trial court sustained the objection, Robledo was cross-examined about portions of his deposition testimony. Robledo did not deny any of the deposition testimony that Orr claimed was inconsistent with his trial testimony. The trial court apparently allowed the deposition as a proffer when it heard Orr's motion for a new trial. In the light of the assigned evidentiary error, we have reviewed Robledo's deposition and testimony.
Orr argues the entire deposition should have been admitted at trial because CCP Art. 1450 allows the deposition of a party to be "used by an adverse party for any purpose." Orr quotes only one clause of the article. When read in its entirety, CCP Art. 1450 is more limited than Orr suggests.
The introductory paragraph A of CCP Art. 1450 states that a deposition may be used at trial "so far as [it is] admissible under the Louisiana Code of Evidence ... in accordance with any of the following provisions: ..." Paragraph A(2), which follows, states that the deposition of a party "may be used by an adverse party for any purpose."
The thrust of Orr's argument is that the trial court erred in assigning any credibility to Robledo. Orr asserts in its brief that Robledo's deposition "reveals many inconsistencies in [his] testimony, and when compared with [his] trial testimony, shows how unbelievable [his] story really is." It is obvious then to us that Orr desired to use the deposition for the purpose of impeachment. This purpose triggers the foundation requirement of LCE Art. 613 that evidence of a prior inconsistent statement is admissible only after the witness "has been given the opportunity to admit the fact and has failed distinctly to do so." See also Comment (d) following Art. 613:
The directives of this Article relative to prior inconsistent statements apply regardless of whether the prior statement was oral, written, or in deposition form. Thus, for example, the provisions of Article 1450 of the Code of Civil Procedure, governing the uses of depositions, must be read as qualified by the provisions of this Code. See, e.g., Art. 403 [exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time].
In Harrison v. State, Dept. of Highways, 375 So.2d 169 (La.App. 2d Cir.1979), the defendant offered the plaintiff's deposition *896 after plaintiff admitted making the statements in the deposition that were read to her on cross-examination. The trial court sustained the plaintiff's objection to the deposition as repetitive of her trial testimony. The defendant argued, as Orr does here, that the right to introduce an adverse party's deposition "for any purpose" under CCP Art. 1450 A(2) was absolute. We found that that right was limited by the prefatory language in Art. 1450 A stating that a deposition is admissible at trial "so far as admissible under the rules of evidence" [amended in 1988 to substitute "Louisiana Code of Evidence" for "rules of evidence"]. Applying this limitation, we said that the trial court had "discretion ... to refuse to admit into evidence the discovery deposition of an adverse party when it is repetitious of matters contained in the record and serves no other purpose." 375 So.2d at p. 178.
Orr's attempt to introduce Robledo's deposition before he was cross-examined was clearly improper under CCP Art. 1450 A and LCE Art. 613 because Robledo had not been asked about, or given an opportunity to admit or deny, his deposition testimony.
During later cross-examination of Robledo, the court permitted Orr's counsel to read from Robledo's deposition and question him about his answers, the foundation requirement of LCE Art. 613. Robledo admitted making each of the statements about which he was questioned. Robledo, for instance, admitted that he did not mention, during questioning by Orr's counsel at the deposition, that he complained or asked Qualls about the amount of his April 14 final paycheck. To the extent that this omission and each of the deposition excerpts read to and admitted by Robledo reflected on his credibility, the arguably impeaching evidence was before the trier of fact even though the entire deposition was not admitted into evidence. The trial court did not limit the manner of, or the questions posed to Robledo on, cross-examination.
Under the above circumstances, we find no error or abuse of discretion in the trial court's ruling that Robledo's entire deposition was not admissible. See and compare Harrison v. State, Dept. of Highways, supra, and Streeter v. Sears, Roebuck and Co., Inc., 533 So.2d 54 (La.App. 3d Cir. 1988), writ denied.
Verrett v. Preston, 374 So.2d 121 (La. App. 1st Cir.1979), is of little avail to Orr and only marginally supports Orr's argument. There, the appellate court found that the trial court should have admitted the plaintiff's deposition at trial over the plaintiff's objection that the deposition was inadmissible because plaintiff "was personally present in court." Here, Robledo objected to the introduction of his deposition on two grounds: that it was irrelevant because he was available for cross-examination, and that no foundation had been laid to use it for impeachment. While Verrett arguably supports Orr's position as to the first ground for the objection, it is not dispositive as to the second ground, the lack of foundation required to use the deposition to impeach Robledo. Verrett did not discuss the language "so far as admissible under the rules of evidence [now Code of Evidence]" in CCP Art. 1450 A that limits the admissibility of an adverse party's deposition at trial.

EMPLOYMENT CONTRACT
Robledo's testimony about the written agreement signed near the end of January is quoted:
Direct examination:
Q. What conversation took place while that was being written and while it was being addressed?
A. Well, the biggest conversation was that I was insecure about my pay plan and that is the reason we gathered to try to make me secure on my pay plan. I had understood that I was going to receive $450.00 per week and that is the reason that we got to the point that we had to sit down and talk about what I was going to get paid.
Q. Was there any discussion with reference to the length of time that you would be working there?

*897 A. Yes sir. There was a discussion verifying that I was going to have employment for six months.
Q. Who told you that?
A. Keith Orr.
Q. It was your understanding that you would be employed at least six months?
A. Yes sir....
Cross-examination:
Q. And when you came to work for Orr, you had no written agreement regarding what you were to be paid?
A. At that point, no sir.
Q. But you understood it was going to be $450.00 per week? That was your understanding?
A. That was my understanding.
Q. At that time you had no guarantee whatsoever regarding the length of your employment, did you?
A. At that time, no.
Q. After you had worked there a couple of weeks, you became dissatisfied because you weren't producing or getting paid $450.00 per week?
A. Right.
Q. So you went to see Mr. Keith Orr because you weren't happy that you weren't getting $450.00 per week?
A. Right.
Q. And you told him, when you met with him, you needed to get $450.00 per week?
A. Right....
Q. [Exhibit] P-1 says this is Rolando Robledo's pay plan and follows on, correct?
A. Yes sir.
Q. Pay plan means that you put in so many hours to make so much money, correct?
A. Yes sir.
Q. The pay plan is the plan under which you were paid, correct?
A. Yes sir.
Q. You testified previously that Mr. Orr also said that you were guaranteed a job for six months. That was your testimony under direct examination?
A. Yes sir.
Q. In your deposition you testified that Mr. Keith Orr said you would be paid for six months or more?
A. He said at six months we would discuss a new pay plan.
Orr's counsel then read from Robledo's deposition, in which Robledo initially said that Keith Orr told him he was "guaranteed a job for six months or more" and later said, "Well, he made me feel like it was for six months or more because that is what he put down on [the pay plan], and his words were at the end of six months, we will rewrite another contract."
Keith Orr testified that there was no guaranteed pay agreement with Robledo until the pay plan was signed. He said Robledo asked for the guaranteed pay because he
was very uncertain of the amount of work we was going to have in the shop. Since it was a new store, a new franchise, a new automobile, the customer base is relatively low. So, what Rolando was concerned about is was there going to be enough work for me to make a living. I was unsure if there was or not so to give him some sort of secure feeling that he would be able to make a living to feed [himself and his six-yearold son] and pay his rent, this is how this [pay plan] came about.
... the reason that I stated that the pay plan was good for six months is it is a policy of mine, and always has been, to always state to the employee the length that the pay plan is good for. Not that I will change it at the end of this term, it is usually a year or six months, but that if I do, I don't want them to be surprised that their pay plan might become changed. The reason we set it up, any type of guarantee, was because of the uncertainty of the amount of work that was going to be coming into the shop. Uncertainty of the amount of cars the factory was going to be sending us. It was just a very uncertain situation. I only had the store a little more than thirty days or something, so we were really uncertain what kind of work was going to come in. How many techs we *898 actually needed. What kind of staffing we had to have back there.
... I put that in there ... so there wouldn't be any shock when I change his pay plan. Because after six months I figure I can evaluate the amount of work coming in. I could adjust his hourly commission rate, down, up, whatever, to where there would be enough work and he could make the kind of money he was expected to make.
Q. Other than his concern for a weekly guarantee, and his dissatisfaction with the fact that he was not getting a weekly guarantee, were you aware of any other concerns or dissatisfactions that Mr. Robledo had at that time, regarding his terms of employment?
A. None regarding his terms of employment.
Q. You heard Mr. Robledo testify that you told him that he was being guaranteed employment for six months?
A. Yes sir.
Q. Did you ever tell Mr. Robledo that he had a guaranteed job there for a six months period?
A. No sir, I didn't.
Q. Have you ever guaranteed employment?
A. I have never guaranteed employment to anyone.
The trial court found that the pay plan constituted a six-month employment contract:
A six month "pay plan" could only convey the parties' agreement to employ, and to work, for a period of 6 months at a certain rate of pay. At the conclusion of 6 months, the employment and the pay rate were to be evaluated by the parties. The testimony further corroborates this document was an employment contract because Mr. Keith Orr testified it was drafted at the request of plaintiff who wanted a guaranteed wage .... plaintiff testified he was seeking job security and an established pay plan.
In its motion for new trial, Orr argued the record did not support the court's finding that Robledo "testified he was seeking job security." Orr also cited Weaver v. Purple Shield Life Ins. Co., 356 So.2d 519 (La.App. 1st Cir.1977), to support its argument that an agreement setting an employee's rate of pay through a certain date does not, of itself, constitute an employment contract for a fixed term.
In its reasons for denying the motion for new trial, the court stated:
The [pay] plan establishes an expressed term for 6 months, and the contract was onerous providing advantages and obligations to both parties. It was clearly a valid contract and inherent in it was at least 6 months guaranteed employment. That is the only interpretation that gives effect to the contract, otherwise either party could have withdrawn to the disadvantage of the other. The Court finds there was a valid contract of employment for a definite term of 6 months.
On this record, we agree that Robledo did not squarely testify that he was "seeking job security," but said only that he was "insecure about his pay plan." Robledo did, however, testify in his deposition and at trial that Keith Orr, while writing the agreement, told him he "was guaranteed a job for six months or more," and that he "was going to have employment for six months."
The fact that an employee is to be paid so much per month or per year does not raise a presumption that he was hired for that period, but only that he will be paid at that rate for whatever time he may serve, unless it is shown that the parties intended or custom dictated the hiring was for the entire period. Binnion v. M. & D. Drugs, 8 So.2d 307 (La.App. 2d Cir.1942). We have no evidence of industry custom here.
As courts have done in other cases where the employer has agreed to pay the employee so much per month or per year for a fixed period, we consider the intent of the parties as found by the trial court and whether the record supports the trial court's finding whether employment was intended for a fixed term.
We compare two cases, the first of which is Weaver v. Purple Shield Life Ins. Co., *899 supra. There the plaintiff was hired as district manager "at a salary of $8,500.00 per year plus $300.00 per year travel expense.... The $8,500.00 per year salary is effective September 15, 1971 through December 31, 1972.... At the end of that period of time, the district manager's salary will automatically be changed to $6,000 per year as a base salary plus [a percentage of collections and business increases]." Weaver was fired in February 1972 and sued for ten months' salary, arguing he had a fixed term of employment until December 31, 1972. The trial court dismissed the action, finding that the letter setting Weaver's rate of pay through December 1972 and providing for a change in pay thereafter did not guarantee that Weaver would be employed through December 1972. The court of appeal affirmed, finding no manifest error in the trial court's acceptance of the employer's testimony that no specific term of employment was intended or agreed to.
The opposite result was pronounced in Roussel v. James U. Blanchard & Co., Inc., 430 So.2d 247 (La.App. 4th Cir.1983). There, the employer, in a letter confirming plaintiff's employment as a salesman, agreed to consider him for the position of sales manager "within a six to twelve month period" and to pay him ten percent of gross profit, plus "$1500, payable each two week period, as a draw against your future sales, for a six month period." Roussel was fired after working for three weeks. The trial court accepted the plaintiff's testimony and found that the parties intended a minimum employment term of six months. The appellate court affirmed the judgment that awarded five months' pay.
Notwithstanding fine semantic distinctions, these cases, Weaver and Roussel, emphasize that on review, the intent element in each case hinges on its own particular circumstances and the trial court's credibility findings.
Here, the trial court accepted Robledo's testimony that Keith Orr verbally verified Robledo's understanding of the written agreement and told him or verified that he would "have employment for six months," notwithstanding Keith Orr's categorical testimony to the contrary.
Under the mandate of Rosell v. ESCO, 549 So.2d 840 (La.1989), we do not disturb factual determinations founded on credibility evaluations of the trial court. Under the circumstances of this record we cannot conclude that the trial court was clearly wrong.

CAUSE FOR TERMINATION
An employee who is hired for a fixed term and is dismissed before the term expires may recover the pay he would have received for the remainder of the term unless the employer had a "serious ground of complaint" for dismissing him. CC Art. 2749. Orr argued at trial that if there was an employment contract for a fixed term, it was justifiably terminated based on Robledo's poor job performance.
Orr's records show that Robledo was fired for "lack of productivity." A mechanic's productivity is measured by the ratio of flag hours to clock hours. Productivity is greater than 100 percent when flag hours exceed actual or clock hours and is less than 100 percent when clock hours exceed flag hours. Robledo's productivity during March and April 1989 ranged from 108 percent for the week ending March 2 to 32 percent for the partial week he worked before he was fired on April 13. Robledo's average productivity for March-April was 76 percent.
Keith Orr and Carl Qualls testified that the weekly productivity of other mechanics at the dealership regularly averaged over 100 percent. Qualls and others who had worked in the service department with Robledo testified Robledo frequently received personal phone calls and visits at work, sometimes took more than an hour for lunch, did not seem to have the technical expertise he had represented himself as having, and sometimes did not finish jobs on time, causing customer dissatisfaction.
Robledo was fired a day or so after he worked on the car of Greg Orr, one of the dealership owners. Greg Orr did not testify. Qualls said he and Greg Orr discussed *900 "the fact that [Greg Orr's] car had not been completed as he desired" and decided to terminate Robledo because of "[his lack of] productivity and the quality of [his] workmanship." Saying this was "not the first time" Robledo's job performance had been discussed, Qualls denied that Robledo was fired "because he messed up the boss's car."
Robledo admitted that he was not a fast worker but testified that he was often given the most difficult and time-consuming work. He said some of the phone calls he got at work were from customers seeking his advice. He admitted that his mother and his girlfriend visited him at the dealership but said they came during non-working time at lunch or after 5:30 p.m.
The trial court found that Orr had "no serious ground of complaint against [Robledo] to justify his termination under the contract. [Several exhibits show that his] hours worked exceeded his minimum guaranteed wages each month." Orr contends, as it did in the motion for new trial, that the trial court was clearly wrong in finding that there was no serious ground of complaint for firing Robledo because the exhibits referred to by the trial court show that Robledo's flag hours did not exceed his guaranteed wages in February or in the first two weeks of April. The trial court denied the motion for new trial and "reaffirmed [its] original judgment" without expressly addressing Orr's specific argument on this issue.
The exhibits show, as Orr contends, that the trial court's finding that Robledo's flag hours exceeded his guaranteed wages "each month" is clearly wrong with respect to February and April. It is clearly right for March. Nevertheless and even though the exhibits show that Robledo's average productivity was only 76 percent in March-April, the court obviously did not believe the testimony of Orr's witnesses concerning their perceived reasons for Robledo's level of productivity. Robledo, of course, gave other plausible reasons. Resolution of this issue in Robledo's favor depended heavily on the trial court's credibility assessments, which we do not second-guess. Rosell v. ESCO, supra; Morris v. Manufacturers' Enterprises, Inc., 442 So.2d 582 (La.App. 1st Cir.1983).
The appeal is from the judgment, not the reasons for judgment. Whitacre v. Halo Optical Products, Inc., 501 So.2d 994, 1003 (La.App. 2d Cir.1987). We must conclude the record, viewed in the light that finds Robledo credible, reasonably supports the judgment awarding damages for Orr's firing of Robledo without a serious ground of complaint.

PENALTY WAGES
Orr does not dispute that Robledo's flag hour pay for April 1-13 was less than the pro-rata portion of his guaranteed pay for that period. The April 14 paycheck included only the flag hour pay for Robledo's last three days of work. On June 29, Orr tendered the pro-rata portion of the April guaranteed pay and penalty wages from June 6, the date it received Robledo's first demand letter. Orr claimed it did not owe penalty wages from April 14-June 5 because it had no notice that Robledo was claiming guaranteed pay, even for April 1-13, until it received Robledo's demand letter on June 6.
Finding that Robledo questioned the amount of his last check on April 14, the trial court awarded penalty wages from April 14-June 5. Orr contends the court was clearly wrong in finding that Robledo questioned the amount of his check on April 14 and argues the omission of the April 1-13 guaranteed pay from that check was a "good faith error," which would preclude an award of penalty wages for the period before the "error" was called to its attention by Robledo's first demand letter.
Keith Orr candidly admitted that he had no reason to dispute that Robledo was entitled to the pro-rata share of the April guaranteed pay when he was terminated. This admission is contrary to Orr's unsupported assumption in brief that Keith Orr testified that the April guaranteed pay was not due until the end of April under the terms of the written agreement.
Having been terminated on April 13, Robledo would not have been earning further *901 flag hour pay from Orr after that date. The fact that his flag hour pay for April 1-13 was less than his guaranteed pay for that period was apparent on April 13 and on April 14 when Robledo was given the check for the flag hour pay he earned in his last week of work.
An employer who discharges an employee must pay "the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, not later than three days following the date of discharge." LRS 23:631 A. If the amount due is disputed, the employer "shall pay the undisputed portion of the amount due as provided for in Subsection A..." § 631 B.
Before its 1977 amendment, the statute required the employer to pay the employee within 24 hours of the employee's discharge, "upon demand being made upon the employer" by the employee. By Acts 1977, No. 317, the legislature removed the requirement for demand by the employee and lengthened the time for payment by the employer from 24 hours to three days. The statutory period for payment supersedes the employer's rules, policies or procedures for paying a discharged employee. Hendrix v. Delta Air Lines, Inc., 234 So.2d 93 (La.App. 4th Cir.1970), writ denied; Powell v. Flotation Services, Inc., 413 So.2d 276 (La.App. 3d Cir.1982), writ denied.
The amount of Robledo's guaranteed pay for April 1-13 was not in dispute, even by Orr's admission, and was due within three days of his termination under LRS 23:631, whether or not Robledo questioned the amount of his check on April 14, and notwithstanding that the pay plan provided for monthly instead of weekly payment of the guaranteed pay. In the light of the statute and Keith Orr's candid admission, we cannot conclude that the omission of the guaranteed pay from Robledo's last paycheck was a "good faith error," as Orr contends. The award of penalty wages for the period before Orr received Robledo's first demand letter is not precluded. See and compare Pace v. Parker Drilling Co., 382 So.2d 988 (La.App. 1st Cir.1980), writ denied, and Pearce v. Austin, 465 So.2d 868 (La.App. 2d Cir.1985).

ATTORNEY FEES
The trial court awarded Robledo attorney fees of $3,087.50 under LRS 23:632 for about 25 hours of legal services rendered through the day before trial. Answering the appeal, Robledo seeks a $4,487.50 increase in the fee for about 36 hours of additional work, including representation at the one-day trial and at the motion for new trial and preparation of a post-trial memorandum and of an appellate brief.
The fees awarded at trial and claimed on appeal include time spent on both the breach of contract claim and the penalty wage claim. The time records of Robledo's attorney do not show how much of the total time was spent on each of the separate claims. There was no attorney fee provision in the written agreement.
Orr contends the fees attributable to the breach of contract claim are not recoverable under LRS 23:632 and asks that we reduce the attorney fee award to 48.97 percent of the fees claimed, the penalty wage award being 48.97 percent of the combined awards for penalty wages and contractual damages.
LRS 23:632 allows recovery of reasonable attorney fees in a "well-founded suit for any unpaid wages whatsoever." The phrase "any unpaid wages whatsoever" includes actual wages due upon termination, as well as penalty wages in cases such as this one where the employer, more than three days after termination but before suit is filed, pays the wages that were due on termination. Pace v. Parker Drilling Co., supra.
Orr was statutorily obligated to pay Robledo the guaranteed wages through April 13 within three days of his termination. Orr's failure to timely pay those wages makes Orr liable for penalty wages under §§ 631-632. Robledo's demand for penalty wages from April 14 through June 5 was based on Orr's failure to timely pay the guaranteed wages for April 1-13. Robledo *902 may recover attorney fees for that well-founded demand under § 632.
Robledo separately demanded the guaranteed pay from April 14 through June 30 as "damages for breach of the employment contract." Robledo has not argued or shown that the guaranteed wages for April 14 through June 30 were due upon termination. On this record, we cannot construe Robledo's demand for contractual damages [guaranteed wages for the period after Robledo's termination], albeit well-founded, as a demand for actual wages due upon termination or penalty wages in contemplation of §§ 631-632, which statutes must be strictly construed. Porter v. Lombardino, 303 So.2d 493 (La.App. 2d Cir.1974), writ denied.
The award of attorney fees must, in our opinion, be limited to the demand for penalty wages for the failure to timely pay the guaranteed wages for April 1-13.
The appellate briefs devote roughly equal treatment to the contractual issues and the statutory issues. The breach of contract and penalty wage awards are relatively equal in amount, although more evidence was elicited at trial on the contractual issues than on the penalty wage issues.
Under these circumstances, we amend the judgment to reduce the trial court's attorney fee award by 50 percent, to $1,543.75, and to additionally award 50 percent of the fees claimed in the answer to the appeal, or $2,243.75, which we find reasonable.
Under § 632, the attorney fee award "shall be taxed as costs to be paid by the employer." In its reasons for judgment, the trial court stated the attorney fees "are taxed as costs." The judgment, prepared by Robledo's counsel and approved as to form by Orr's counsel, cast Orr for $12,080.30, consisting of $8,992.80 in contractual damages and penalty wages, with legal interest from date of judicial demand, and $3,087.50 in attorney fees, with legal interest from date of judgment, "together with all costs of this suit." Although Orr has not complained in this regard, we amend the judgment to conform to the statutory mandate that the attorney fees be taxed as costs. See Powell v. Flotation Services, Inc., supra.

DECREE
The attorney fees totaling $3,787.50 are taxed as costs, as § 632 directs, which are assessed to Orr. We otherwise affirm the judgment and assess costs of the appeal to Orr.
In the respects mentioned, the judgment, as amended, is AFFIRMED.