594 So.2d 1332 (1991)
Glenda A. GIBSON and James Sheppard, Plaintiffs-Appellants,
v.
BOSSIER CITY GENERAL HOSPITAL, et al., Defendants-Appellees.
Nos. 22693-CA, 23002-CA.
Court of Appeal of Louisiana, Second Circuit.
November 26, 1991.
*1335 Larry Johnson, Shreveport, Gary L. Boland, Baton Rouge, Robert S. Cooper, Jr., Port Haywood, for plaintiffs-appellants, Glenda A. Gibson and James Sheppard.
Cook, Yancy, King & Galloway by Samuel W. Caverlee, Cynthia C. Anderson, Shreveport, for defendant-appellee, Dr. A.L. Wedgeworth.
Mayer, Smith & Roberts by Paul R. Mayer, Sr., Paul R. Mayer, Jr., Shreveport, for defendant-appellee, Dr. Gerald Dzurik.
Lunn, Irion, Johnson, Salley & Carlisle by Gerald M. Johnson, Shreveport, for defendants-appellees, State Farm Fire & Cas. Co. and Nancy Darland.
Watson, Blanche, Wilson & Posner by Randall L. Champagne, Baton Rouge, for defendant-appellee, Bossier City General Hospital.
Before SEXTON, BROWN and STEWART, JJ.
BROWN, Judge.
Resolution of this appeal entails an examination of the correct standards to be applied by a trial court in deciding whether to set aside a jury's verdict as contrary to the weight of the evidence. The specific issues in this medical malpractice action are the trial court's denial of plaintiffs' motions for judgment notwithstanding the verdict (JNOV) and for a new trial. Both motions challenged the quality of the jury's judgment.
Plaintiffs, Glenda Gibson and James Sheppard, filed this lawsuit claiming that the death of their child, Derrell Wayne Sheppard, was caused by the negligence of defendants. Plaintiff, Glenda Gibson, entered Bossier City General Hospital (BCGH) to give birth. The baby was overdue and born by Cesarean Section on May 14, 1980. Plaintiffs claim that the applicable standards for neonatal care were breached by defendants resulting in immediate injuries and the eventual death of the child seventeen months later. The petition named as defendants the treating pediatricians, Drs. A.L. Wedgeworth and Gerald Dzurik, BCGH, Nancy Darland, R.N., and her insurer, State Farm Fire and Casualty Company.
At the conclusion of a lengthy jury trial, a verdict was returned in favor of defendants. The first interrogatory in the special verdict form was whether any defendant was negligent and, as to each defendant, the jury's answer was "no". Having found that defendants were not negligent, the jury never answered the question of whether the death was caused by the acts of defendants.
Plaintiffs filed motions for JNOV and for a new trial. The trial court denied these motions finding that this verdict could have been reached by reasonable men and women. We conclude that the trial court properly denied the JNOV and did not abuse its discretion in finding that the verdict was supported by a fair interpretation of the evidence.
In exercising our appellate review function, we are cognizant of the trial court's unique and advantageous position to observe the events at the trial and thus better assess the evidence and jury's verdict. This is a case in which the jury was faced with sharply conflicting expert testimony on the negligence issue which it resolved in defendants' favor. In evaluating the decision of the trial court in denying the motions, we recognize that it is the province of the jury to resolve conflicting inferences from the evidence. Rosell v. ESCO, 549 So.2d 840 (La.1989); Dawson v. Clark, 564 So.2d 1291 (La.App. 2d Cir.1990).
The inherent power of the trial court to set aside a jury's verdict and either grant judgment or order a new trial focuses on the desire to provide every litigant with substantial justice. The power is broad to ensure that justice is done but the proper standards for setting aside a jury's verdict are elusive and defy precise definition. Nevertheless, a close examination of the jurisprudence reveals principles that assist in identifying the boundaries for evaluating such motions.
*1336 Although LSA-C.C.P. Art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict, the standards have developed jurisprudentially. The JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. The finding that the evidence was insufficient as a matter of law requires that there was no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury. The test is harsh because a finding that a verdict is not supported by any substantial evidence leads to a directed verdict terminating the action without resubmission to another jury. In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all the evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving to this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Willis v. Louisiana Power & Light Company, 524 So.2d 42 (La.App. 2d Cir.1988), writ denied, 525 So.2d 1059 (La.1988).
On the other hand, the denial of a motion for new trial is discretionary with the trial court and should not be reversed unless there has been an abuse of that discretion. Freeman v. Freeman, 552 So.2d 636 (La.App. 2d Cir.1989); Willis v. Louisiana Power & Light Company, supra. The motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. Whether to grant a new trial requires a discretionary balancing of many factors.
The ground asserted for a new trial in the instant case is that the verdict was clearly contrary to the law and the evidence. LSA-C.C.P. Art. 1972. Even when a JNOV is denied the trial court could still grant a motion for new trial. Willis, supra. The mere fact that some evidence created a factual issue that prevented the granting of a JNOV does not deprive the trial court of the power to intervene by granting a new trial in an appropriate case. The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact-finding is the province of the jury and a trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Willis, supra.
Although the language is similar between the standards for a JNOV and new trial, there is a real difference between a finding that no evidence existed for a rational jury to reach a particular result and a finding that a jury could not have reached its conclusion on any fair interpretation of the evidence. A JNOV is required when there is no bona fide factual issue, while it is the existence of a factual issue which justifies the granting of a new trial rather than a directed verdict.
The scales are clearly tilted in favor of the survival of the jury's verdict but the trial court is left with a breadth of discretion which varies with the facts and events of each case. What the appellate court reviews is the decision of the judicial participant in the trial who has attempted to balance the great deference afforded to the jury's verdict against its obligation to insure that substantial justice was accomplished. Our review is limited to whether manifest error was committed by the trial court in its denial of the motions. Bellard *1337 v. CNA Insurance Company, 503 So.2d 1104 (La.App. 3d Cir.1987).
Applying these principles we conclude that the trial court did not commit manifest error in its denial of the motions for JNOV and new trial.
In a medical malpractice action, plaintiff carries a two-fold burden of proof. Plaintiff must first establish by a preponderance of the evidence that the treatment fell below the ordinary standard of care expected in that medical specialty and then establish a causal relationship between the alleged negligent acts and the injury. LSA-R.S. 9:2794; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La. 1991).
An unsuccessful course of treatment is not per se an indication of malpractice. The doctor's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised. The physician will not be held to a standard of perfection nor evaluated with benefit of hindsight. Opinions from medical professionals are necessary to the determination of the applicable standard of care and if that standard was breached. The views and opinions of these expert witnesses, though not controlling, are persuasive. It is for the trier of fact to evaluate conflicting expert opinions in relation to all the circumstances of the case. Stein v. Insurance Corporation of America, 566 So.2d 1114 (La.App. 2d Cir. 1990), writ denied, 569 So.2d 984 (La.1990); Maxwell v. Soileau, 561 So.2d 1378 (La. App. 2d Cir.1990), writs denied, 567 So.2d 1123 (La.1990) and 567 So.2d 1124 (La. 1990); Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175 (La.App. 2d Cir.1988), writ denied, 532 So.2d 133 (La. 1988); Douzart v. Jones, 528 So.2d 602 (La.App. 2d Cir.1988); Jackson v. Huang, 514 So.2d 727 (La.App. 2d Cir.1987), writs denied, 518 So.2d 1050 (La.1988) and 519 So.2d 119 (La.1988); Butts v. Cummings, 488 So.2d 1169 (La.App. 2d Cir.1986), writ denied, 494 So.2d 327 (La.1986).
Glenda Gibson was admitted to Bossier City General Hospital on May 13, 1980 by her physician, Dr. Timothy Hart, for a C-SECTION delivery. Glenda was 16 years old when the baby was conceived and the admission was necessitated by the baby being overdue. Glenda's pediatrician, Dr. A.L. Wedgeworth, was requested to attend the birth and he agreed even though he was scheduled to depart on vacation later that day. The baby was born at approximately 8:25 a.m. on May 14, 1980 and weighed 8 pounds 14 ounces. Following the delivery, Dr. Wedgeworth was handed the baby and he was vigorously dried. The baby was limp and his respiratory efforts were not good. Dr. Wedgeworth administered Narcan (which neutralizes the effects of narcotics such as opiates and Demerol) to improve the baby's respiration and muscle tone. Dr. Wedgeworth assumed that some narcotics had been transferred from the mother to the baby prior to delivery and was satisfied with the response to the medication. Oxygen was also administered for approximately 10 minutes. Dr. Wedgeworth determined that good oxygen saturation was achieved because of the baby's improved color.
Dr. Wedgeworth conducted a physical examination while the baby was still in the delivery room warmer and was satisfied. Dr. Wedgeworth took the infant to the newborn nursery for admission at approximately 8:40 a.m. Dr. Wedgeworth finished his examination in the nursery assisted by the charge nurse, Nancy Darland. The infant was found normal with the exception of acrocyanosis or a bluish discoloration of the hands and feet. Dr. Wedgeworth issued routine orders for the care of the baby in the nursery. Dr. Wedgeworth returned to his office and remained until noon when he left on a scheduled vacation.
A nursing assessment and a Dextrostix stick test to measure the infant's blood sugar level was administered upon admission to the nursery with normal results. The baby was placed in an isolette in the nursery and checked continuously over the next several hours. At approximately one hour after admission, Nurse Darland opened the isolette to evaluate the baby's condition and found it satisfactory.
*1338 At approximately 12:20 p.m., Nurse Darland noticed the baby appeared cyanotic or bluish in color. She concluded that he was having respiratory difficulty due to mucus which is a recognized risk in C-SECTION babies as opposed to a vaginal delivery which tends to force the mucus out by compressing the lungs. Nurse Darland suctioned the baby's mouth and throat and gave it oxygen for approximately two minutes. The baby became pink in color and responded to a foot slap. Nurse Darland noted that the baby appeared to be somewhat lethargic. She returned the baby to the isolette with instructions for close observation.
At approximately 1:00 p.m., Nurse Darland left for a pre-scheduled meeting. An R.N. and LPN were available on the floor for consultation if needed in Darland's absence. At that time, the other babies had been taken to their mothers for feeding. Plaintiffs' baby was left under the direct care of an experienced nurse's aide who was instructed to watch it closely. Between 1:00 and 1:30 p.m., the baby was taken to his mother's room and shown to his parents for approximately 5 minutes. At approximately 1:30 p.m. when the aide attempted to give the baby a water bottle feeding he became cyanotic. The aide immediately summoned assistance, including Nurse Darland.
Upon her return to the nursery at 1:40 p.m., Nurse Darland telephoned Dr. Dzurik and informed him of the two cyanotic episodes. Dr. Wedgeworth had arranged for Dr. Dzurik to take his calls while on vacation but had not furnished any information about the infant. Dr. Dzurik believed at that time that the baby had a problem with mucus and at approximately 1:45 p.m. issued orders for a blood gas test to check the amount of oxygen in the bloodstream and a chest x-ray to check the heart and lungs. The baby was given another shot of Narcan at 1:48 p.m. to which there was no response. The baby's stomach was lavaged with very little return of water or mucus. Dr. Dzurik considered other possible causes for the cyanosis and telephoned additional orders at 2:10 p.m., including a laboratory blood sugar test.
At approximately 2:30 p.m. the child had another cyanotic episode. The baby "pinked up" upon the administration of oxygen but remained cyanotic from the knees down. At approximately 2:40 p.m., the blood gas test results were reported. Nurse Darland telephoned Dr. Dzurik with the results and reported the third cyanotic episode. After the third cyanotic episode, Dr. Dzurik felt that the possibility of mucus as the source of the baby's difficulties was more remote and immediately went to the hospital.
At approximately 3:00 p.m. the laboratory reported that the blood sugar sample taken at 2:30 p.m. revealed a rare blood sugar level of zero. The nursing shift at the hospital changed and Judy Preston, R.N. relieved Nurse Darland as charge nurse. Upon his arrival at the hospital at 3:00 p.m., Dr. Dzurik was updated by Nurse Darland on the test results, particularly the blood sugar level.
Dr. Dzurik and Nurse Preston immediately began to attempt the insertion of an IV for the purpose of infusing glucose which was the recognized corrective treatment for low blood sugar. Efforts at inserting the IV were not successful and during this time, the baby had apneic episodes or the cessation of breathing and acrocyanosis. A respiratory therapist assisted in administering oxygen to the infant and at approximately 3:30 p.m. Dr. Dzurik ordered a shot of glucogon to mobilize any remaining liver glycogen into glucose.
Dr. Dzurik chose not to infuse glucose into the infant's stomach through a tube because of the apneic episodes which could cause the infant to choke. During attempts to insert the IV, the infant remained fairly pink and Dr. Dzurik did not recall any decline in the baby's heart and respiratory rate which were being monitored on the KDC or specialized infant care bed.
At approximately 4:00 p.m. Dr. Dzurik ceased his efforts to insert an IV and elected to insert an umbilical artery catheter (UAC), which he considered the least preferred method. The UAC requires that a *1339 catheter be threaded through an artery eventually ending in the aorta. Although commonly used with premature babies, the UAC involves the possibility of a blood clot or infection. At this time the infant's blood sugar level had been at zero for approximately one and one-half hours. After inserting the catheter, the infusion of glucose began. Hospital records reflect that glucose was administered through the catheter between 4:30-4:45 p.m. Dr. Dzurik remained at the hospital and kept the child under constant observation. His condition appeared to improve and by 5:05 p.m. the blood sugar level was normal. The infant was given a water feeding at approximately 5:30 as well as formula feedings at approximately 7:00 and 9:00 p.m. with no apparent difficulties.
Although the baby appeared to have recovered, by 9:00 p.m. the infant developed a rash and was jittery. Shortly after 11:00 p.m. the baby stopped breathing and began having seizures. At 11:45 p.m. the baby's pupils were noted to be fixed and dilated. At 12:05 a.m. Dr. Dzurik elected to transfer the baby to the neonatal intensive care unit at Schumpert Medical Center. Thereafter, until his death, the infant required repeated medical treatment and hospitalizations. He was diagnosed as being blind and severely mentally retarded.
Approximately seventeen months after birth, on October 28, 1981, Dr. Dzurik examined the infant and found a high fever and a red throat. Dr. Dzurik believed the baby had a virus and after medication, the baby was sent home. The following day, the baby was seen by another doctor and again diagnosed as having a probable viral illness. The child was allowed to go home with instructions to return if his condition worsened. On October 30, 1981 the infant died at home. The coroner, Dr. George McCormick, established the cause of death as cardial pulmonary failure secondary to a cleft palate, approximately 1.0 centimeters in size, and coarctation of the aorta, a heart defect. It appears that these conditions had never been detected by any of the infant's numerous physicians.
The trial on the merits consisted primarily of complex expert testimony. Much of this testimony centered on whether the infant had been born blind and brain damaged or whether the brain damage and blindness were the result of the alleged untimely diagnosis and treatment of hypoglycemia at birth. The autopsy of Dr. George McCormick found a congenital heart defect. The infant's pituitary and thyroid glands were abnormally small but Dr. McCormick was unable to state whether that abnormality occurred before or after birth. The autopsy found a small penis, small testicles and small prostate. Dr. McCormick had no opinion as to whether this occurred before or after birth. The infant had adrenal cortical atrophy and atrophy of the right cortical hemisphere indicating that the right side of the brain was smaller than expected. Further, there was a porencephalic cyst in the tip of the right temporal lobe which consisted of a large cyst with loss of brain material. Once again, Dr. McCormick was not certain whether these had developed prior to or subsequent to birth.
There was an increased amount of fluid in and around the brain due to substance being lost and replaced by fluid. Dr. McCormick found the absence of the septum pellucidum, a thickened membrane in the middle of the brain that separates one side from the other. There was a microgyral pattern on the frontal lobes which was an abnormality of the formation of the convolutions of the brain. Dr. McCormick did not determine whether the blindness had been present at birth. In Dr. McCormick's opinion the cause of death was the febrile illness which was related to heart and lung failure and inflammation in the lungs from the cleft palate. The heart and lung failure, particularly the heart, was due to defects in the heart and other systems prior to birth.

LIABILITY OF DR. WEDGEWORTH
Dr. Wedgeworth's involvement with this baby was limited to about twenty minutes immediately following birth. Plaintiffs contend that Dr. Wedgeworth breached the standard of care in his specialty by *1340 issuing routine orders and in failing to alert Dr. Dzurik of the baby's high risk status. The baby was born at approximately 42.5 weeks gestation or was post-mature. The child could have been classified as an LGA (large gestational age) infant because his weight exceeded 4,000 grams. Further, the baby had been delivered by C-SECTION to a young mother following indications of intrauterine fetal distress. Plaintiffs' claim that these factors should have mandated closer observation and more careful monitoring of the baby's blood sugar levels.
Although plaintiffs' expert pediatrics witness, Dr. William Kinder, testified that he would have personally ordered more careful observation for three to four hours following birth, Dr. Kinder admitted that the infant's care was adequate. Most importantly, the evidence established that at birth the infant appeared to be a healthy newborn with no visible congenital anomalies. While the infant weighed approximately 4,026 grams, this did not necessarily mandate a finding of LGA. Dr. William Haynie, defendants' expert pediatrician, testified that the baby was a borderline LGA as it was under 9 pounds which was his cut-off weight in this regard. While the baby was considered to be post-mature by age, "term" is considered anywhere from 37 to 42 weeks gestation. Further, the infant was not post-mature by appearance as he did not display the common characteristics which would have placed the infant at a higher risk.
Although there was an increased risk for congenital anomalies due to the mother's age at conception, this did not require a change in the standard orders. The mother had never been diagnosed as suffering from gestational diabetes which would have placed the baby at higher risk for hypoglycemia and the baby's initial blood sugar level test upon admission to the nursery was normal. Dr. Wedgeworth testified that he "felt (the baby) was at great risk because of the maternal age of sixteen years and the multiple congenital anomaly (that) usually accompany this ..." Dr. Wedgeworth explained that the risk of congenital anomalies was not an apparent current risk and may take years to appear and that "you don't set them apart and put them in an intensive care nursery just because the mother's sixteen."
Dr. Wedgeworth testified the orders he issued were standard routine orders in 1980. He had full confidence in Nurse Darland's ability to monitor the infant and relied on this in issuing the orders. The infant appeared to be healthy upon his initial examination and would be observed closely in the nursery. The risk factors were documented and fully appeared in the hospital records. Thus the information was available to anyone caring for this baby.
A physician's conduct is evaluated in terms of reasonableness under the circumstances existing when his professional judgment is exercised. Under these circumstances a jury of reasonable men and women could have found in favor of Dr. Wedgeworth.

LIABILITY OF DR. DZURIK
Plaintiffs' primary arguments of negligence concern the conduct of Dr. Dzurik in diagnosing and treating the infant's hypoglycemia. As noted above, Dr. Dzurik was first contacted at approximately 1:45 p.m. and told of the infant's two cyanotic episodes. He issued test orders believing that the infant was in some sort of respiratory or cardiac distress, the most common causes of newborn cyanosis. Upon further consideration, Dr. Dzurik telephoned in additional orders including a laboratory blood sugar level test. Upon being notified of the third cyanotic episode, Dr. Dzurik departed for the hospital without waiting for the test results. Upon learning of the zero blood sugar level after his arrival at the hospital, he immediately began preparations to infuse glucose. After encountering complications in insertion of the IV, Dr. Dzurik abandoned his attempts and inserted an UAC.
Although plaintiffs' expert, Dr. Kinder, testified that Dr. Dzurik should have been more watchful and considered hypoglycemia earlier and once considering it, should *1341 have ordered a Dextrostix which would have yielded an answer in minutes, the evidence established that the infant did not present the classic signs of hypoglycemia during this time period such as jitteriness which would have accelerated this diagnosis. Further, the laboratory blood sugar level test was considered far superior and more reliable than Dextrostix even though it took longer to receive the results. Dr. Kinder opined that Dr. Dzurik had waited too long to leave for the hospital but other experts indicated that his departure for the hospital approximately one hour after the initial report of cyanosis was not negligent. According to other experts Dr. Dzurik acted appropriately in his ordering of tests for the infant and by going to the hospital when he began to rule out mucus as the baby's problem.
The evidence is conflicting and does not eliminate the conclusion that the attempt to infuse glucose by IV was not a breach of the requisite standard of care. Due to apneic episodes, administering glucose through the stomach could have resulted in a more serious problem. Dr. Dzurik first attempted the most preferred method for glucose infusion by means of an IV which carried less chance of infection and did not have the possible complications of an UAC. Dr. Dzurik worked continuously on the baby for approximately an hour before electing to insert the UAC. During this time, the infant had fairly good color and his vital signs were continuously monitored by the KDC bed. Dr. Haynie testified that Dr. Dzurik's decision to continue his attempts to insert the IV was simply a judgment call. Dr. Dzurik fully recognized the potential serious effects of the rare blood sugar level and a jury could have found that he exercised good medical judgment in his attempts to infuse glucose considering the condition of the infant during this time.
Plaintiffs assert that Dr. Dzurik was negligent in failing to diagnose and treat the infant's cleft palate which was discovered during the autopsy. Dr. Dzurik testified that he had looked in the infant's mouth on different occasions and had specifically examined the baby's mouth during checkups for any abnormalities but had never observed a cleft palate. Dr. Kinder believed that Dr. Dzurik had breached his standard of care in failing to detect the cleft palate over the period of time that he had examined and treated the child. We note, however, that this infant was hospitalized and treated by numerous physicians during the course of his lifetime and the cleft palate was not observed until the autopsy. There was no evidence of any peculiar symptoms or illnesses which would have alerted Dr. Dzurik to the presence of a cleft palate. Under these circumstances the jury's finding of no negligence is supportable by the evidence.
Finally, plaintiffs alleged that Dr. Dzurik was negligent in failing to hospitalize the infant prior to his death after an examination in his office found a fever in excess of 105°. Dr. Dzurik ordered a penicillin injection and antibiotic by mouth. The child's fever dropped while he was at the office and Dr. Dzurik believed he was suffering from some type of viral infection. Dr. Dzurik consulted with another physician who examined the baby the following day with basically the same conclusion. It appears from the evidence that the medical treatment administered by Dr. Dzurik was appropriate and, in any event, the evidence did not establish that the failure to hospitalize the infant altered the ultimate outcome of the illness.

LIABILITY OF NURSE DARLAND
Plaintiffs primarily contend that Nurse Darland negligently breached the applicable standard of care in failing to recognize the baby's risk factors; in failing to recognize signs of neonatal hypoglycemia and notify Dr. Dzurik; and, in failing to administer a Dextrostix to check the infant's blood sugar level after the first cyanotic episode.
A nurse who practices her profession in a particular specialty service owes to her patients the duty of possessing the degree of knowledge or skill ordinarily possessed by members of her profession actively practicing in such a specialty service under similar circumstances. It is the *1342 nurse's duty to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing profession in good standing who practice their profession in the same specialty service and to use reasonable care and diligence, along with his/her best judgment, in the application of his/her skill to the case. Nurses who perform medical services are subject to the same standards of care and liability as are physicians. Cangelosi v. Our Lady of Lake Medical Center, 564 So.2d 654 (La.1989); Ewing v. Aubert, 532 So.2d 876 (La.App. 1st Cir.1988), writ denied, 551 So.2d 1333 (La.1989).
After reviewing the record, we find the evidence does not support a finding that Nurse Darland breached the applicable standard of medical care. Plaintiffs' nursing expert, Roberta Glasscock, testified that Nurse Darland's failure to recognize the baby's risk factors was a serious breach. There was no evidence, however, that Nurse Darland had overlooked these risk factors. Nurse Darland assisted in the initial examination of the infant by Dr. Wedgeworth and also filled in a nursing assessment. She closely observed the infant during the hours following his birth and was fully aware of the higher risk for respiratory problems due to the C-SECTION delivery and the age of the mother. Although the infant had risk factors associated with the development of neonatal hypoglycemia, the evidence did not establish that Nurse Darland was negligent in failing to make this diagnosis. The infant did not display the classic presenting signs of hypoglycemia and responded well to oxygen indicating the problem was due to mucus, a common complication.
Defendants' nursing expert, Marie Kelly, testified that a number of things could have been wrong with the baby and the option that Nurse Darland chose, that is stimulating and suctioning the infant, was appropriate. Kelly stated that the baby could have been cyanotic due to an excessive amount of mucus, the effects of narcotics or hypoglycemia. Kelly would have picked the possibility of mucus and suctioned the baby. After stimulating the baby, Kelly would have watched the infant closely and if an episode occurred again she would have notified a physician which is exactly the course of conduct undertaken by Nurse Darland.
Plaintiffs' nursing expert also faulted Nurse Darland for failing to check the infant's blood sugar level by Dextrostix after the first cyanotic episode. At this time it was believed that the infant was suffering from a problem with mucus and the infant responded well to treatment. Although Glasscock testified that nurses are allowed to perform tests, such as Dextrostix, in emergency situations that they would not ordinarily perform on their own, there was no evidence that Nurse Darland should have concluded that such an emergency situation existed. Further, it appears that hospital policy would have prohibited Nurse Darland from performing such a test. The medical standards of care in 1980 did not include routine testing with Dextrostix which was considered by some medical professionals to be unreliable.
Plaintiffs argue that Nurse Darland breached the standard of medical care in her failure to notify Dr. Dzurik after the first cyanotic episode. Dr. Haynie testified that Nurse Darland acted appropriately and stated that had she telephoned him, he would have told her to watch the baby closely and would not have taken any aggressive action at that time. The conduct of Nurse Darland in stimulating and suctioning the baby was appropriate in light of the C-SECTION delivery. The baby responded adequately to Nurse Darland's action and his condition did not present a medical emergency. The jury could have concluded that Nurse Darland was not negligent in not notifying Dr. Dzurik at this time but rather electing to maintain close observation of the baby. Nurse Darland did immediately contact Dr. Dzurik to notify him of the second cyanotic episode which was more indicative of a serious problem.

LIABILITY OF BOSSIER CITY GENERAL HOSPITAL
Plaintiffs contend that the hospital is liable pursuant to the doctrine of respondeat *1343 superior for the negligent conduct of its nursing staff. Plaintiffs argue the nurses attending the infant were negligent in their failure to recognize the signs of neonatal hypoglycemia and in their treatment of the infant. Plaintiffs also assert that the hospital was negligent in its operation of the newborn nursery.
It is well-settled that a hospital is responsible for the negligence of its employees including nurses under the doctrine of respondeat superior. In a medical malpractice action against a hospital, plaintiff must prove that a hospital caused the injury when it breached its duty. The hospital must exercise that amount of care required by a particular patient and must protect that patient from external circumstances peculiarly within the hospital's control. A determination of whether the hospital has breached its duty of care owed to a particular patient depends upon the facts and circumstances of the case. Cangelosi v. Our Lady of Lake Medical Center, supra; Tabor v. Doctors Memorial Hospital, 563 So.2d 233 (La.1990); Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1122 (La.1984); Daniel v. St. Francis Cabrini Hospital, Etc., 415 So.2d 586 (La.App. 3d Cir.1982).
The discussion concerning Nurse Darland is applicable to the liability of the hospital. On cross-examination, plaintiffs' own expert, Dr. Kinder, essentially retracted his statements that the nursing staff had fallen below the normal standard of medical care. The testimony of Dr. Haynie and Nurse Kelly established that the nurses had acted appropriately and the nursery was adequately staffed. It appears that the only breach of standard medical procedures occurred when Nurse Preston slapped the baby's foot when the UAC was in operation. The policy prohibiting such a foot slap was to avoid the complication of a spasm in the arteries in the lower extremities, which complication did not occur. The record does support the jury's verdict in favor of the hospital.

CAUSATION
The jury did not answer the interrogatory in the special verdict form on the issue of causation. LSA-R.S. 9:2794 requires a plaintiff not only to prove a breach of the standard of care but also a causal relationship between that breach and the injuries. While plaintiffs' experts generally testified that the brain damage and other physical defects such as blindness were consistent with the failure to timely diagnose and treat hypoglycemia, the evidence presented by defendants' experts strongly point to the finding that the infant's injuries were the result of a congenital condition known as septo-optic dysplasia with the damage occurring intrauterine.
Dr. Robert McVie, a pediatric endocrinologist, and Dr. Susan Clay, a pediatric neurologist, both testified that the baby's problems had occurred during the pregnancy, which finding was supported by the autopsy results. Simply stated, patients with septo-optic dysplasia have hypothalamic dysfunction. Dr. Clay described the hypothalamus as the "power station" where everything starts. The hypothalamus relays information to the pituitary which in turn sends information to the thyroid, the adrenal glands and all other endocrine systems. If something happens at the hypothalamus, things do not "work right" from that point on.
The infant was noted to have fixed dilated pupils in the very first 12-16 hours of life which is an early documented indication of optic dysplasia. The infant had the documented loss of multiple endocrine hormonal levels such as thyroid and growth hormone. The infant also had the absence of a septum pellucidum which is the hallmark of this syndrome. A small head and no symptoms of massive hydrocephalus pointed to the conclusion that the septum pellucidum had not formed in the womb prior to birth. Further, the infant had a hole in the porencephaly which is seen in many patients with septo-optic dysplasia.
Drs. Clay and McVie believed that the infant developed severe hypoglycemia because the malformations around and involving the hypothalamus did not allow his *1344 normal hormones to be developed and work properly. Thus the infant had no way of releasing extra glucose from his body to combat the low blood sugar. Dr. Clay testified unequivocally that the infant's blindness could not have been caused by hypoglycemia.
The finding that the infant's "injuries" had occurred before birth is further supported by the micropenis. Dr. McVie explained that at approximately 16 to 17 weeks the fetal hypothalamus relays a message to the pituitary for the release of testosterone. The pituitary in turn releases a hormone which goes to the testes and stimulates them to make more testosterone. Only if this normal process occurs would there be continued growth of the baby's penis. McVie stated that the micropenis was a very significant finding as it indicated something about the development of hormone producing glands in the fetus while in the womb.
Due to the number of problems suffered by this infant, the evidence indicates that defendants' conduct did not cause the injuries and eventual death. Therefore, plaintiffs failed to satisfy their burden of proof as required in LSA-R.S. 9:2794.

ADMISSIBILITY OF INTERROGATORIES
Plaintiffs argue that the trial court erred in precluding them from introducing in rebuttal certain sworn answers to interrogatories by Drs. Dzurik and Wedgeworth. Plaintiffs offered the written answers on rebuttal without having confronted the two physicians with these answers during their testimony. Plaintiffs generally contended that the answers were self-authenticating and therefore admissible. Defendants objected relying on several arguments including the lack of a proper foundation.
LSA-C.C.P. Art. 1459 provides that answers to interrogatories may be used at trial to the extent permitted by the rules of evidence. As these interrogatories were, in effect, offered for the purpose of attacking the credibility of or impeaching these physicians the provisions of Article 613 of the Code of Evidence are applicable. Article 613 provides as follows:
Except as the interests of justice otherwise require, extrinsic evidence of bias, interest, or corruption, prior inconsistent statements, conviction of crime, or defects of capacity is admissible after the proponent has first fairly directed the witness' attention to the statement, act, or matter alleged, and the witness has been given the opportunity to admit the fact and has failed distinctly to do so.
The comments to this article state that its directives relative to prior inconsistent statements apply regardless of whether the prior statement was oral, written or in deposition form. It appears clear that this article is applicable to answers to interrogatories. Therefore, plaintiffs first had to comply with the foundation requirements of Article 613 of the Code of Evidence before they could use these answers. The record does not reflect that such a foundation was laid and thus the trial court did not err in excluding these answers from evidence. This court has recently reached a similar conclusion with the regard to the admissibility of deposition testimony at trial for the purpose of impeachment. See Robledo v. Orr Motors of Louisiana, Inc., 582 So.2d 892 (La.App. 2d Cir.1991), wherein we affirmed the trial court's exclusion of plaintiff's deposition from evidence because of defendant's failure to lay a proper foundation under Article 613 of the Code of Evidence.
Plaintiffs' argument in brief that these answers to interrogatories by Drs. Dzurik and Wedgeworth were to rebut the coroner's testimony and to discredit the opinion of the medical review panel is also without merit. If this was the purpose then plaintiffs should have pursued this intent when Drs. Wedgeworth and Dzurik testified or should have called these physicians back for further testimony on that issue. Then with a proper foundation the answers could have been introduced for impeachment. The best evidence to attack the opinion of the coroner and review panel would have been the testimony of the witnesses. Otherwise because these answers to interrogatories *1345 were offered in rebuttal no explanation would have been available.

ADMISSIBILITY OF AUTOPSY REPORT
Plaintiffs argue that the trial court erred in permitting defendants' counsel during opening statements, over objection, to read portions of the coroner's autopsy report to the jury and to introduce said report into evidence, over objection, for purposes other than impeachment.
The autopsy report would have been admissible into evidence under Art. 803(8) of the Code of Evidence. Further, Dr. McCormick testified at trial concerning the autopsy report and was subjected to rigorous cross-examination by plaintiffs' counsel. It was proper for the jury to consider that the autopsy report was less equivocal than Dr. McCormick's testimony concerning whether the baby's physical deficiencies had occurred prior to or after birth. Other witnesses also made reference to the autopsy report which had apparently been used by them in formulating their testimony and these witnesses were also subject to rigorous cross-examination. We do not find error in the trial court's handling of the autopsy report, and further recognize that any arguable error would have been harmless.

EXPERT WITNESS FEES
Finally, plaintiffs argue that the trial court abused its discretion in taxing excessive expert witness fees and further, by awarding an expert witness fee to Dr. Haynie who allegedly stated he was testifying without charge.
It is well-settled that an expert witness is entitled to reasonable compensation for his court appearance and preparatory work. The trial court has the discretion to fix the amount of the fee. As such an award lies within the discretion of the trial court, it will not be altered on appeal absent a showing of an abuse of discretion. Davis v. Husqvarna Motor, 561 So.2d 847 (La.App. 2d Cir.1990), writ denied, 569 So.2d 958 (La.1990); Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir.1988); McGee v. Miears, 516 So.2d 1241 (La.App. 2d Cir.1987).
Following the trial on the merits, defendants filed a rule to tax expert witness fees as costs of court seeking expert witness fees for Drs. McVie, Clay, Haynie and McCormick. The trial court awarded expert witness fees as follows: Drs. McVie $1,250; Clay $1,600; Haynie $1,000; McCormick $1,250. In its opinion, the trial court specifically noted that it took cognizance of the amount of time that each expert was on standby and actually testified in court.
We find that the amounts awarded by the trial court are reasonable. We particularly note the length of time that each expert spent testifying and the complexity of the testimony which required in-depth preparation such as researching the pertinent medical literature and thoroughly examining the infant's medical records. The trial required the physicians to be away from their practice for a substantial period of time and they are entitled to reasonable compensation. We further find that Dr. Haynie did not testify that he was appearing for no fee but rather indicated that he had not been paid for his appearance. Thus, Dr. Haynie is entitled to receive an expert witness fee.

DECREE
For the reasons stated herein, the jury verdict in favor of defendants is AFFIRMED at plaintiffs' costs.