628 So.2d 196 (1993)
Thomas R. LAING and Laurie H. Laing, Plaintiffs-Appellees,
v.
AMERICAN HONDA MOTOR CO., INC., and Honda Motor Co., Ltd., et al., Defendants-Appellants.
No. 25159-CA.
Court of Appeal of Louisiana, Second Circuit.
December 1, 1993.
Rehearing Denied January 13, 1994.
*199 Duplass, Witman, Zwain & Williams by Lawrence J. Duplass, Bernard J. Williams, Metairie, for defendants-appellants.
Unglesby & Koch by Lewis Unglesby, Karl J. Koch, Stephen R. Edwards, Baton Rouge, for plaintiffs-appellees.
Before VICTORY, BROWN and WILLIAMS, JJ.
BROWN, Judge.
A 25-year-old Morehouse Parish farmer, Thomas Laing, purchased a three-wheel all-terrain vehicle (ATV) manufactured by Honda. Four days later, while riding the ATV in the course of his farming operation, Laing was seriously injured. Laing and his wife, Laurie Harrell Laing, brought a products liability action against the retailer, Moeller's, Inc., the distributor, American Honda Motor Co., and the manufacturer, Honda Motor Co., Ltd. Plaintiffs alleged that the ATV was unreasonably dangerous for normal farm use.
A jury found for the Laings. The distributor and manufacturer (collectively referred to as "Honda") were held responsible. The action against the retailer was dismissed. Damages of $5,654,794.37 were awarded to Laing. Mrs. Laing was awarded $250,000 for loss of consortium. The jury apportioned to Honda 75% and to Laing 25% of the fault. The award was then reduced to reflect Laing's percentage of fault. The trial court partially granted Honda's post-trial motion for judgment not withstanding the verdict (JNOV) by decreasing Mrs. Laing's loss of consortium award to $100,000. In all other aspects, the trial court rejected Honda's post-trial motions and maintained the jury's verdict. It is from this modified judgment that Honda appeals. Plaintiffs answered Honda's appeal seeking reinstatement of the jury's loss of consortium award.

FACTS
On November 14, 1985, Thomas Laing bought a new 1985 Honda ATC 250SX three wheeler from Moeller's, Inc., in Bastrop, Louisiana. Laing, who had a degree in agronomy from LSU, farmed land in Morehouse Parish. On November 18, 1985, between 4:00 and 5:00 p.m., Laing left riding this newly purchased three wheeler to inspect his fields to determine if they were ready for planting. That evening Laing's wife reported him missing and the following morning at 8:30 a.m. a search party found Laing lying unconscious, face down, in a turn row or tractor path running between cotton fields. Laing remained in a coma for two months.
There were no witnesses to the accident and Laing was unable to recall what happened. Reconstruction experts for both parties conducted tests on Laing's and a similar ATV, considered the description of the scene given by members of the search party, viewed photographs of the scene taken on the day Laing was found and personally viewed the scene. Although these experts disagreed on the plaintiff's speed and the specific maneuver causing the accident, they did agree that: 1) Laing was riding the ATV along a rough path between cotton fields when he encountered a dirt clod or mound; 2) Laing and the ATV were found approximately 20 to 30 yards beyond the clod, which was about a foot high and more than a foot in diameter; 3) the ATV was damaged on its left side; 4) the top of the clod appeared to have been knocked off; 5) ATV tracks led up to the clod; 6) the headlights of the ATV were not on; and 7) Laing, an experienced motorcycle and ATV rider, was not wearing a helmet at the time of the accident. According to plaintiffs' experts, Laing was traveling 15 to 25 m.p.h. when he turned to avoid the mound and the ATV flipped over. Defense experts believed Laing drove over the mound at about 35 m.p.h., causing him to go airborne and lose control. In estimating speed, plaintiff's experts emphasized the light damage to the ATV while defense experts stressed the distance traveled by the ATV from the mound to its final location.
Laing suffered a severe traumatic brain injury and was in a coma for approximately two months. Thereafter, he underwent intensive rehabilitation and had to be retaught such basic functions as speaking, reading and bowel and bladder control. Laing, who was discharged from the hospital in June 1986, approximately 7 months after his accident, *200 still requires assistance and cannot feed himself or perform other simple tasks such as writing or cooking.
Laing's two-year-old daughter was sent to St. Louis, Missouri, to live with her mother's parents while Mrs. Laing devoted all of her time to caring for her husband during his comatose and recovery period. The daughter was frightened when she finally saw her father. After doing all she could for her husband, Mrs. Laing moved to St. Louis to care for her daughter and eventually obtained a divorce.

DISCUSSION

JUDGMENT NOTWITHSTANDING THE VERDICT

CAUSATION
This is a case in which the jury was faced with sharply conflicting expert testimony on the cause-in-fact of the accident which was resolved in plaintiffs' favor. Defendants sought to have this determination set aside by the trial court through a motion for judgment notwithstanding the verdict (JNOV). The inherent power of the trial court to set aside a jury's verdict and grant a contrary judgment focuses on the desire to provide every litigant with substantial justice. In Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991), we stated:
Although LSA-C.C.P. Art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict, the standards have developed jurisprudentially. The JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. The finding that the evidence was insufficient as a matter of law requires that there was no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury. The test is harsh because a finding that a verdict is not supported by any substantial evidence leads to a directed verdict terminating the action without resubmission to another jury. In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all the evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving to this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Willis v. Louisiana Power & Light Company, 524 So.2d 42 (La.App. 2d Cir.1988), writ denied, 525 So.2d 1059 (La.1988).
What an appellate court reviews is the decision of the trial court. Our standard of review is limited to whether manifest error was committed by the trial court in denying the motion. Gibson, supra. In applying these principles to this case we conclude that the trial court did not commit manifest error in denying the motion for JNOV as related to the issue of causation.
Honda argues that plaintiffs did not establish that the ATV's alleged defect (lateral instability) was a cause-in-fact of Laing's accident. According to defendants, the cause of the accident was Laing's hitting a dirt clod 12-18 inches high at an excessive speed, which caused the ATV to flip several times. Honda claims that the clod was so large "that one could not reasonably expect the most stable of vehicles to hit it and remain upright." Plaintiffs assert that regardless of whether the ATV flipped as a result of Laing hitting the dirt clod or because of a sudden swerve executed to avoid the dirt clod, the cause-in-fact of the accident was the vehicle's inherent instability.
In a products liability action plaintiff must establish by a preponderance of the evidence a causal link between the accident and the alleged defect in the product. Whether the harm resulted from an admitted defect in the condition or design of a product is a question of fact. Page v. Gilbert, 598 So.2d 1110 (La.App. 4th Cir.1992), writs denied, 605 So.2d 1146, 1150 (La.1992). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the reviewing court may feel that its own evaluations and inferences are as reasonable. Blair v. Tynes, 621 So.2d *201 591 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
When this cause of action arose, a product was unreasonably dangerous per se or by reason of its design if the danger of the product outweighed its utility. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986); McCoy v. Otis Elevator Co., Inc., 546 So.2d 229 (La.App. 2d Cir.1989), writ denied, 551 So.2d 636 (La.1989).[1] A product may be unreasonably dangerous due to its design because: (1) a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the usefulness of the product; (2) although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs and uses with less risk of harm to the user; or (3) although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences. Halphen, supra at 114.
According to Dr. Robert Wright, an expert in force analysis and dynamics (accident reconstruction), the 1985 Honda ATC 250SX is unsafe because of its susceptibility to a forward pitch roll. If the ATC rider voluntarily or involuntarily turns the handle bars 10-15 degrees without leaning and shifting his weight, the machine will flip over in a forward and sideward direction. Its high center of gravity causes the ATC to have one-half of the lateral stability needed to be safe. His calculations show that, with a rider, the 250SX becomes laterally unstable at a speed of less than 10 m.p.h. The Honda ATC can not make a sudden unplanned turn because of this lateral instability. Because in all-terrain situations, an ATV rider will encounter sudden obstacles and be forced to execute sudden turns, Dr. Wright believed that the Honda ATC 250SX was not safe at 1/3 of its maximum speed of 49 m.p.h. In reconstructing the accident, Dr. Wright physically inspected the site and the ATV, reviewed the testimony of members of the search party and performed tests on the ATV. Dr. Wright concluded that Laing was riding the ATV at a speed of 15-25 m.p.h. when he encountered a dirt clod. When Laing suddenly swerved to miss the clump, the ATV's lateral instability caused it to go into a forward pitch roll and flip over. His speed calculation was primarily based on the damage to the ATV.
Andrew McPhate, professor of mechanical engineering at Louisiana State University, testified that at any speed above 15 m.p.h., the Honda ATC 250SX is defective. Dr. McPhate further testified that a three-wheel design with its high center of gravity is inherently dangerous for an off-the-road vehicle. According to Dr. McPhate, the ATV's stability decreases with greater speed. Because of the instability inherent in a three-wheel design, any unforeseen obstacle will cause an accident, regardless of the rider's level of experience. Dr. McPhate noted that there was no evidence supporting the conclusion that Laing hit the dirt clod. However, whether Laing hit the dirt clod or swerved to avoid it, Dr. McPhate concluded the accident was caused by the ATV's lateral instability or propensity to flip over.
Kevin Breen, a consultant specializing in human factors engineering, testified for Honda. According to Breen, Laing's accident could have been caused either by his hitting the dirt clod or by swerving to avoid it. Dr. Graham Fowler, Honda's expert in accident reconstruction, also testified. After considering the testimony of those who found Laing, Dr. Fowler concluded that the dirt clod was the initiating event in the accident. Dr. Fowler, however, agreed that in an all-terrain situation riders are required to execute emergency maneuvers to avoid unforeseen obstacles and that a sudden turn of only 5 degrees may cause separation of the rider from the vehicle. Both Dr. Fowler and Breen determined Laing's speed to have been 35 m.p.h. because of the distance the ATV traveled after striking the dirt clod. They concluded that Laing ran over the clod and lost control.
*202 We note that this three-wheel machine is no longer sold new in the United States. The jury's conclusion that the ATV was unreasonably dangerous because its risk outweighed its utility was supported by legitimate and substantial evidence. If a vehicle, designed for heavy farm use and being driven normally, cannot avoid or withstand a mound of dirt in a turn row without the risk of serious injury to its rider, a reasonable jury could conclude that the vehicle failed the test set forth in Halphen. On appeal, Honda does not dispute the jury's finding of a defect but claims that the defect, lateral instability, was not the cause of the accident. In support, Honda points to Laing's unreasonable use of the ATV by driving at an excessive speed and directly striking the obstacle. The jury considered the testimony describing the scene by members of the search party, the photographs taken at the scene when Laing was found, the tests conducted by experts for both sides and the opinions of these experts. The trial court correctly denied the JNOV motion. The verdict was supported by legitimate and substantial evidence. A valid line of reasoning and permissible inferences, as expressed by plaintiffs' experts, allowed the determination that Laing was traveling at a reasonable speed and that the instability of the ATV was the cause-in-fact of the accident. That Laing was an experienced ATV rider, was not wearing a helmet and may have been riding at dusk without lights was considered by the jury in assessing Laing with 25% fault.

EVIDENTIARY RULINGS

COMPARATIVE RISK EVIDENCE
Honda argues that the trial court committed an error of law and thus abused its discretion by excluding its study of comparative risks. The trial court's rulings occurred prior to trial pursuant to a motion in limine filed by plaintiffs. The trial judge excluded Honda's evidence under L.C.E. Articles 401 and 403, stating:
[T]he testimony that Dr. McCarthy (Honda's expert) would purport to give deals with the notion of comparative risk analysis in which, in this context, the risk of riding an all-terrain vehicle (ATV) must be compared with other encountered recreational activities such as snowmobiling, skate-boarding, parachuting and the like....
This court is inclined to agree ..., that the all-terrain vehicle manufactured by Honda must be judged and evaluated on its own merits, not in regard to snowmobiles, or bungee jumping apparatus, go-carts or any other remotely analogous recreational activity.
[T]he Court feels that the introduction of the comparative risk evidence will only serve to confuse the jury, introduce extraneous, arcane and abstruse issues into the trial and needlessly prolong the presentation of evidence in a case which is already promising to be quite tedious and lengthy.
L.C.E. Article 401 defines relevant evidence as evidence having any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. The trial court is allowed wide discretion in determining relevant evidence and its ruling will not be disturbed absent a clear abuse of this discretion. State v. Mosby, 595 So.2d 1135 (La.1992); State v. McNair, 597 So.2d 1096 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1113 (La. 1992); Arledge v. Bell, 463 So.2d 856 (La. App. 2d Cir.1985).
L.C.E. Article 403 provides that though relevant, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time." A trial judge's assessment of the probative value of evidence is accorded great weight. Horton v. McCrary, 620 So.2d 918 (La.App. 3d Cir.1993); Hebert v. Angelle, 600 So.2d 832 (La.App. 3d Cir.1992), writ denied, 604 So.2d 997 (La.1992).
Whether the utility of the 1985 Honda ATC 250SX as a farm machine outweighed its risk of danger was an issue for the jury. Honda countered evidence introduced by plaintiffs regarding the risks associated with the ATC with testimony from several experts of the ATC's utility as a recreational vehicle, in addition to its use in farming and industrial *203 situations. Honda's proffered evidence of risks associated with a myriad of different products and recreational activities, such as snowmobiles, go-carts and bungee jumping, though interesting, was not necessary for the jury's determination of this particular product's utility as a farm instrument. As noted by the trial judge, this study had the potential of confusing the issues. We find no error in the trial judge's exclusion of this evidence. See City of Greenville v. W.R. Grace & Co., 827 F.2d 975 (4th Cir.1987); Rowan County Board of Education v. U.S. Gypsum, 103 N.C.App. 288, 407 S.E.2d 860 (1991).

OTHER ACCIDENTS AND PRIOR KNOWLEDGE
Honda claims that the trial court erroneously admitted evidence of other ATV accidents occurring prior to the present case. Particularly, Honda claims that these prior accidents were not shown to be substantially similar to Laing's accident. Defendants specifically refer to: Honda advertising outtakes; Honda employee workers' compensation documents; evidence concerning additional warnings placed on Honda ATVs by U-Haul; and a videotape of Laing's ATV.
The trial court denied Honda's motion in limine to exclude advertising film outtakes. In filming for a recreational commercial these outtakes showed the vehicle flipping. The trial court, however, agreed to give a precautionary instruction to the jury that this evidence applied only to the issue of Honda's knowledge and was not proof of a specific defect. Furthermore, defendants were given the opportunity to call as witnesses the riders shown in the videos.
The trial court also denied defendants' motion in limine to exclude evidence of workers' compensation claims filed by Honda employees who test drove the ATV, finding that these documents constituted business records and were relevant to the issue of Honda's knowledge. The trial judge limited plaintiffs to introducing only claims involving ATCs of the 250 class and defendants could have called the employees involved to testify to facts surrounding their accidents.
The trial court allowed the U-Haul documents and correspondence into evidence on the issue of Honda's prior knowledge that its warnings on the ATC were not adequate. U-Haul had placed its own warnings on the ATCs it purchased from Honda because U-Haul felt the manufacturer's warnings were inadequate. Defendants countered this evidence with expert testimony that the warnings placed on the ATC by U-Haul were unnecessary, confusing and inaccurate.
Defendants also assert that the trial court erred in admitting into evidence a videotape of Laing's ATV. This tape showed the vehicle without a rider and was used by Dr. Wright in making his calculations regarding the speed and angle at which the ATV flips over. Defendants thoroughly cross-examined Dr. Wright on his experiments and conclusions.
We find no error in the trial court's admission of these items into evidence.

HEDONIC DAMAGES AND STAN SMITH'S TESTIMONY
Dr. Stan Smith, an economist, testified for plaintiffs on the issues of Tommy Laing's loss of enjoyment of life and loss of earning capacity. Honda asserts that the trial court erred in allowing Dr. Smith to calculate and quantify Laing's damages for loss of enjoyment or pleasure of life, citing Foster v. Trafalgar House Oil & Gas, 603 So.2d 284 (La.App. 2d Cir.1992).
In Foster, supra, a writ panel ruled that any evidence, including expert testimony, that attempts to quantify or assign a specific monetary value for alleged loss of the pleasure of life (hedonic damages), is inadmissible. We note that Foster was decided after the trial of the instant case and in Foster the issue was presented in the form of a writ application to prohibit the introduction of this type of evidence at the upcoming trial. In the instant case, the jury was specifically instructed that they could accept or reject the testimony of any expert witness and that whether or not damages were due was within their sole discretion. In fact, the jury did not award the $2,200,000 figure calculated by Dr. Smith as the loss of enjoyment of life *204 suffered by Tommy Laing, but made an award of $1,350,000 for Laing's loss of enjoyment of life and mental anguish. (Emphasis added). Honda cross-examined Dr. Smith extensively and presented their own expert in economics, Dr. Jerome Staller, on the issue of hedonic damages.
Regardless of whether Dr. Smith's testimony should have been allowed, there is ample evidence in the record to support the jury's award of $1,350,000 to Laing for loss of enjoyment of life and mental anguish. Laing suffered a severe traumatic brain injury and was in a coma for over two months. He underwent intensive rehabilitation and, more than seven years after his accident, requires assistance to perform basic tasks. He is unable to feed himself and cannot enjoy such activities as writing and cooking.
Laing suffers from spastic hemiperisis, a significant weakness of his right arm and leg that causes spasticity. Plaintiff has an intention tremor which, when he tries to use his left hand, causes it to shake such that he has no control over its movement. Plaintiff also suffers from authria, a speech impediment, and his head trembles, especially when he is tired. Laing's tremors are progressively worsening and are not expected to improve. His spasticity, coordination and speech problems will also not improve.
Plaintiff has a traumatic encephalopathy, which means that his brain has shrunk and the resulting space in his skull has been filled with spinal fluid. This condition affects his brain function; his short term memory is damaged and his mental capacity to evaluate and judge what goes on around him has been affected.
Laing's social life has been radically changed and he understandably suffers from depression. Laing could not even remember his wife and daughter after the accident. He is unable to be the type of father or husband that he was before the accident.
Thus, even if it were error to allow Dr. Smith's testimony on the issue of the money value of hedonic damages, we find that the record, independent of this testimony, supports the jury's award for loss of enjoyment of life and mental anguish. See American Manufacturers Mutual Insurance Co. v. General Motors Corp., 582 So.2d 934 (La. App. 2d Cir.1991).
Defendants also assert that the trial court erred in allowing Dr. Smith to testify on the issue of Laing's loss of future earning capacity. Honda argues that this testimony was speculative and that Dr. Smith's calculations were based on inaccurate information. Specifically, Honda argues that Dr. Smith used a letter, not introduced into evidence, from Dr. Marlin Brandon, director of the California Rice Experimental Station, discussing employment positions. According to defendants, Dr. Brandon's testimony was substantially different from the letter, and, therefore, by allowing this testimony, the trial court erred.
Honda emphasizes that Dr. Brandon could not state in his testimony that he would have definitely offered Laing a position as either a breeder's assistant or foreman. Further, Dr. Brandon testified that the positions for which Laing was qualified were either filled or had not yet been created. According to defendants, the only facts regarding Laing's employment and employment opportunities are as follows. Laing held a full-time position with the Louisiana Rice Research Station for approximately two years, earning $14,000 annually. He voluntarily resigned from this position in May 1984 to take over the family farm operation. At the time of his accident, Laing had a five year lease on his father's farm and was in the process of securing leases on additional farm acreage. Laing was intending to expand his farming operation. Because Laing's tax returns reflected a loss for six consecutive years, he was not realizing any income prior to his accident.
In determining an award for loss of earnings and earning capacity, what the plaintiff earned before and after the injury is only part of the measure. While plaintiff's earnings at the time of injury are relevant, they are not necessarily determinative of his future ability to earn. Hobgood v. Aucoin, 574 So.2d 344 (La.1990); Folse v. Fakouri, 371 So.2d 1120 (La.1979); Coco v. Winston Industries, 341 So.2d 332 (La.1976). Damages should be estimated on the injured person's ability to earn money, rather than what *205 he actually earned before the injury. Damages may be assessed for the deprivation of what the injured plaintiff could have earned. The theory is that the injury has deprived the plaintiff of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Hobgood, supra; Folse, supra; Bacle v. Wade, 607 So.2d 927 (La.App. 2d Cir.1993).
The factors to be considered in determining loss of future income include plaintiff's physical condition before and after his injury; his age and life expectancy, prior to and after the accident; his previous earnings; his work record; the amount plaintiff probably would have earned absent the injury; and the probability he would have continued to earn wages over the balance of his working life. Anderson v. Bennett Wood Fabricators, 573 So.2d 1135 (La.1991); Keeth v. Dept. of Public Safety & Transportation, 618 So.2d 1154 (La.App. 2d Cir.1993); Finnie v. Vallee, 620 So.2d 897 (La.App. 4th Cir.1993).
In computing loss of future income, it is necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury. A determination must also be made of whether plaintiff has been disabled from work for which he is fitted by training and experience. Keeth, supra; Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir. 1988).
Dr. Marlin Brandon's deposition was read into the record. Dr. Brandon was Laing's supervisor at the LSU Experimental Station (Rice Research Institute) in Crowley, Louisiana, for approximately two years before accepting his current position in California. According to Dr. Brandon, Laing was qualified for several positions in California, with salaries ranging from $15,000 to $25,000. Though he did not testify that he definitely would have hired Laing, he did state that he would have considered employing Laing as a breeder's assistant or foreman if he had the best qualifications.
The deposition of Joseph Musick, resident director of LSU Agricultural Experimental Station in Crowley, was also read into the record. Dr. Musick testified that Laing was qualified for a position as a full-time research associate with an annual salary of $19,000. He also stated that he would hire Laing for this position if he were the most qualified.
Dr. Smith calculated Tommy Laing's total loss of earning capacity to be $1,182,639. Dr. Smith based his calculations for loss of earning capacity as an agricultural professional on letters written by Drs. Brandon and Musick. Although these letters were not introduced into evidence, the deposition testimony of each witness was read into the record. We note that the letters contained no additional facts or information and further, counsel for Honda had the chance to question both witnesses regarding Laing's employment possibilities. In order to recover damages for loss of earning capacity, the plaintiff need not be working or even in a certain profession to recover. What is being compensated is his lost ability to earn such an amount and he may recover such damages even though he may never have taken advantage of that capacity. Finnie, supra.
The trial judge did not err in allowing Dr. Smith's testimony regarding Laing's loss of earning capacity. This assignment of error is without merit.

JUDGMENT NOTWITHSTANDING THE VERDICT

LOSS OF CONSORTIUM
A jury's quantum award, if below or above a reasonable amount given the evidence, is an error remedied by a judgment notwithstanding the verdict. LSA-C.C.P. Art. 1811(F); Lilly v. Allstate Insurance Co., 577 So.2d 80 (La.App. 1st Cir.1991), writ denied, 578 So.2d 914 (La.1991); Brantley v. General Motors Corp., 573 So.2d 1288 (La. App. 2d Cir.1991), writ denied, 577 So.2d 17 (La.1991). (Emphasis added). The inquiry to be made by the trial judge is whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). (Emphasis added).
*206 A JNOV should be granted only when the evidence, viewed in the light most favorable to the party opposing the motion, points so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach a contrary verdict. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Gibson, supra. If there is evidence of such quality and weight that reasonable jurors might reach different conclusions, the motion should be denied. Anderson, supra; Scott v. Hospital Service District No. 1, 496 So.2d 270 (La. 1986). In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all of the evidence in the light most advantageous to the party in whose favor the jury verdict was rendered, giving to this party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott, supra; Gibson, supra.
Once the trial court has applied this threshold standard and found that the verdict is not reasonably supported by any legitimate evidence, it must set aside the verdict, make an independent assessment of the damages and award an appropriate amount. Furthermore, the trial court is not limited to changing the quantum to the highest or lowest amount reasonable, but may set the amount at whatever it deems a proper sum. Anderson, supra. (Emphasis added).
In the present case, the trial court did not follow such a standard of review. The trial court made no determination of what evidence was presented. It begged the question by stating that it knew of no other case where such an amount was awarded for loss of consortium. The trial court did not evaluate the evidence and offered no legitimate justification for its determination. Thus, we are constrained to review the facts in the light most favorable to maintaining the jury's verdict to determine if any legitimate evidence exist to support that decision. (Emphasis added).
Tommy and Laurie Laing, former childhood sweethearts, were married on July 11, 1981. Their daughter, Amanda, born on October 14, 1983, had just celebrated her second birthday when Tommy's accident occurred. As a farmer's wife, Laurie helped out "by doing whatever she could." On the date of the accident, Laurie got a telephone call from her husband around 3:30 p.m., asking her to have his supper ready and clothes laid out for an agricultural meeting in Bastrop. Laurie testified that she began to worry when she hadn't heard from Tommy by 7:00 p.m. By 9:00 p.m., after making a few telephone calls and failing to locate Tommy, she began to panic. When the sun came up the following morning and Tommy had not been found, Laurie testified that she believed her husband was dead.
After learning that Tommy had been found, Laurie met the ambulance at the emergency room. She testified that Tommy was dirty, covered with ant bites, unresponsive and immobile. Because it was suspected that Tommy had sustained a severe spinal or head injury, he was moved to the St. Francis Medical Center in Monroe. Laurie was told later that evening that her husband had suffered a severe closed head injury and was in a deep coma. She was also advised that Tommy was probably not going to "make it" and that she should consider donating his organs.
Laurie moved to the hospital to stay with her husband. Her parents came from St. Louis to care for Amanda. Laurie lived in the waiting area of the hospital until February 1986 when Tommy was moved to New Orleans for rehabilitation. Laurie testified that while Tommy was in intensive care, she was allowed to visit him four times a day in 15 minute intervals. She learned to bathe him and clean out his breathing tube. While he was comatose, Laurie talked to him and played the radio and television in attempts to "get him to come out of it." Laurie testified that she could not afford to live in New Orleans while Tommy was going through rehabilitation but that she regularly visited with help from the church.
Tommy did not recognize either Laurie or Amanda and had to be told who they were. When he was discharged in June 1986, Tommy was still unable to feed or bathe himself and had not yet regained bowel or bladder control. Because Laurie was unable to care *207 for both her husband and the child, Amanda lived with her grandparents in St. Louis. Amanda, who had not seen her father since November 1985, was frightened when, after several months, they visited. Amanda would have nothing to do with her father.
By October of 1986, Laurie felt that she had done all she could for Tommy. He had regained bladder control and was able to express himself better. Because he had family that could care for him and her daughter needed her, Laurie moved to St. Louis. Eventually the Laings divorced, though both Laurie and Tommy testified that they keep in touch. Tragically, the marital life of a normal young couple was ended by the accident.
Laurie testified that like other married couples, she and Tommy had some disagreements and had talked of separating prior to his accident. However, it was the results emanating from the accident that forced the decision to move to St. Louis.
We find that the evidence presented was legitimate and substantial and that reasonable people could differ as to the amount or value of Laurie's loss. The jury's award of $250,000 for Laurie's loss of consortium is, however, unreasonably high. Laurie has established a new life and at trial was engaged to remarry. The trial judge did not consider the evidence and applied the wrong criterion in granting the judgment notwithstanding the verdict. See Adams v. Security Insurance Company of Hartford, 543 So.2d 480 (La.1989). His reduction of the jury's verdict, however, was reasonable under the circumstances. Bergeron v. Blake Drilling & Workover Co., 599 So.2d 827 (La.App. 1st Cir.1992), writs denied, 605 So.2d 1117, 1119 (La.1992). Laurie's life with Tommy started as high school sweethearts and ended tragically a few short years later. We affirm the trial court's reduction of the loss of consortium award.[2]

CONCLUSION
The judgment of the trial court partially granting the JNOV by reducing the award for loss of consortium to Laurie Laing is affirmed. In all other respects, the trial court's denial of the JNOV and the jury's verdict is affirmed. All costs of the proceedings, below and in this court, are assessed against defendants.
VICTORY, J., concurs in result.

APPLICATION FOR REHEARING
Before MARVIN, LINDSAY, VICTORY, BROWN and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] This cause of action arose prior to the enactment of the Products Liability Act, LSA-R.S. 9:2800.51 et seq. This act was determined to apply prospectively. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991).
[2] The writer strongly suggests that this issue should be reurged in a rehearing application.