PITMAN, J.
Plaintiffs-Appellants Logansport Gaming, L.L.C., Logansport Truckstop, L.L.C., and Logansport Gaming, L.L.C., d/b/a Sabine River Restaurant (collectively, "Logansport"), appeal the trial court's judgments in favor of Defendants-Appellees Ark La Tex Fire Systems, LLC ("Ark La Tex") and Hallmark Specialty Insurance Company ("Hallmark").[1] For the following reasons, we affirm the judgments of the trial court.
FACTS
On March 6, 2015, Logansport filed a petition for breach of contract and damages against Ark La Tex and its liability insurer. Logansport stated that, on February 10, 2000, it contracted with Ark La Tex to purchase, install, maintain and inspect a fire suppression system (the "System") to be installed in the restaurant located in Logansport's truck stop. It explained that the System is required to be inspected by a licensed individual or company on a bi-annual basis and that Ark La Tex is licensed by the State of Louisiana to perform this inspection and maintenance. It stated that Ark La Tex agreed to maintain the System in a manner in which it was intended to operate so that, in the event of a stove/cooktop fire, it would activate to suppress the fire and minimize damage to Logansport's property; to perform the required inspections and any work or maintenance on the System to ensure that Logansport was in compliance with any state or federal regulations or requirements; and to perform inspections and maintenance in accordance with the National Fire Prevention Association code (the "NFPA") and guidelines. It noted that, on July 12, 2010, Ark La Tex performed an inspection of the System and placed a sticker on it designating that it had been inspected, and then, in August 2010, Ark La Tex performed maintenance on the System and placed a sticker on it certifying that it was in working order. Logansport stated that, on January 31, 2011, a gas fire ignited at the stove protected by the System, which caused severe property damage. It alleged that, due to Ark La Tex's breach of contract or negligent performance of its contractual duties, the System did not activate to terminate *1117 the fire, and this failure of the System to operate caused damage to Logansport's property. It alleged that Ark La Tex breached the contract by failing to properly inspect, maintain and repair the System with the agreed-upon terms and requirements as set forth by the NFPA. Logansport's insurer, Scottsdale Insurance Company ("Scottsdale"), denied coverage, rendering Logansport uninsured for the damage resulting from the fire.[2] Logansport alleged that, as a result of Ark La Tex's breach of contract, it suffered the following non-exclusive damages: property damage; loss of profits; loss of business reputation; penalties from the Gaming Division of the Louisiana State Police; cost of reconstruction; cost of litigation with Scottsdale; other general and special damages; mental anguish, humiliation and embarrassment; expert witness fees; and interest and costs of the proceedings.
On July 18, 2014, Ark La Tex filed an answer. It denied Logansport's allegations for lack of sufficient information, requested a jury trial and requested judgment in its favor and against Logansport.
On September 2, 2015, Ark La Tex filed a supplemental and amending answer. It alleged the fault of unknown third persons shown in a surveillance video of the fire in which they failed to act timely and used an accelerant on the fire. It also alleged the fault of Scottsdale in failing to timely adjust and/or pay for reconstruction of the premises. It pled the doctrine of spoliation of evidence on the basis that Logansport discarded, or allowed to be discarded, the remnants of the cooktop, along with its related assemblies, as well as various portions of the System. It asserted that these allegations and pleas should result in a complete bar to all claims for damages asserted by Logansport, or, alternatively, that such constitutes comparative fault and/or fault of third persons that should reduce Logansport's damages.
A jury trial began on March 21, 2016. Wayne Yates testified that he is the nephew of Leon Miletello, who owns the truck stop. He stated that the truck stop consists of a convenience store, a restaurant and a video poker gaming room and that he worked at the truck stop as the operations manager from 1998 to 2006 and then became the owner of the convenience store. He noted that he was the manager of the restaurant when David Scoggin of Ark La Tex installed the System in 2000. Mr. Yates testified that it was his understanding that, if there was a stove/cooktop fire, the System would operate automatically to extinguish the fire and there was nothing a person needed to do. He stated that Mr. Scoggin did not explain to him how the System worked, but did tell him that, if there was a fire that did not extinguish, the System had a manual pull bar that would need to be pulled. He noted that Mr. Scoggin did not teach him how to inspect the System and did not train any employees about what to do in case of a fire. He stated that Mr. Scoggin did not tell him that he needed to perform monthly inspections of the System and did not give him an owner's manual. He testified that Mr. Scoggin told him that the System needed to be periodically inspected in accordance with the State code and that it was his understanding that Mr. Scoggin would perform these inspections. He stated that *1118 the System was inspected, as demonstrated by dated stickers on the System, but that he did not observe the inspections. He testified that he did not clean the System, but did clean the filters, which were metal baffles on the cooktop's vent hood, on a monthly basis. No one cleaned the exhaust hood or the ducts, but the cooktop was cleaned every day. He stated that he was not present for either of the System's fireless activations in 2010. He testified that, when the fire occurred on the morning of January 31, 2011, he was not present at the truck stop and did not know if the System had activated. As a result of the fire, there was some damage to the convenience store. He stated that the restaurant brought customers into the gaming room and the convenience store and that, after the fire, he observed a decrease in the number of people visiting the truck stop and in fuel sales. After the fire, he acted as a point person while rebuilding the restaurant. He stated that Scottsdale denied Mr. Miletello's insurance claim, so Mr. Miletello instructed him to save as much money on the rebuild as possible. The layout of the building changed when it was rebuilt, and they had to do certain things to comply with the Health Department's code. He stated that they did not add any special "bells and whistles" and only did what was necessary. He testified that he never did anything to deactivate the System, that no one related to Logansport ever discussed such a notion and that he would not know how to deactivate the System. He also testified that he had no knowledge of a CO2 cartridge prior to the fire.
On cross-examination, Mr. Yates testified that there were manual fire extinguishers located in the kitchen. He further testified that, when the restaurant reopened in March 2012, fuel sales increased. When asked about the fireless activations that occurred in 2010, he stated that no one told him that the System was inoperable. He testified that he had no recollection of Mr. Scoggin not coming when called or of him being uncooperative.
Sheila King testified that she began working at the truck stop in 2003 and became the manager of the restaurant in 2006. She described procedures in place for cleaning appliances in the kitchen-the cook cleaned the cooktop every night; the dishwasher cleaned the baffles in the vent hood once a week; and a third party cleaned the inside of the vent hood every three months. She testified that she did not know anything about the System until after the fire and that she was not responsible for cleaning the System. She stated that she was aware of the first fireless activation that occurred in July or August 2010. She was not present when this happened, but it was her understanding that Mr. Scoggin fixed the System. She noted that the System had a second fireless activation in August 2010. She received a call from the cook notifying her of the activation, so she went to the restaurant to help clean up oil off the floor. An employee notified Ark La Tex of the fireless activation, and Mr. Scoggin acted like he was angry to be there. She stated that she did not know what he did while there and that he did not say anything to her about the operation of the System, about not using the cooktop, about the cooktop being inoperable or about the System being inoperable. She admitted that some employees were aggravated that they had to clean up again after the second fireless activation; and one employee, Jennifer Braxton, threatened to quit if she had to clean up again. Ms. King stated that she did not deactivate the System, did not show any employee how to do so and did not know how to do so herself. She further testified that, on January 31, 2011, she received a call from an employee that there was a fire at the restaurant. She arrived at the truck stop and watched the restaurant burn. She *1119 noted that the cook was responsible for turning on the cooktop in the morning; but, on the day of the fire, the cook was not at work. She stated that an employee in the convenience store who previously worked in the kitchen turned on the cooktop and then returned to the convenience store believing a cook was on the way to work.
On cross-examination, Ms. King testified that, when the System activates, it creates a mess, including foam that comes out of the System and oil that boils out of the cooking appliances. She noted that she was concerned the System would activate again. She stated that, after the August 2010 activation, she was not aware of any parts being removed from the System, but heard that a part had been ordered for it. Between August 2010 and January 2011, she did not call Mr. Scoggin to work on the System and, to her knowledge, no employee called him. She discussed the cleaning process of the kitchen and noted that the majority of the time she was not present when the kitchen was cleaned at night but that it was clean when she arrived in the morning. She stated that she inspected the cooktop once or twice a week. She also stated that, on the morning of the fire, her mother opened the restaurant, but did not know how to turn on the cooktop, so another employee did so.
Jennifer Braxton testified that she first became employed at the truck stop in August 2009 as a dishwasher, became a cook in December 2009 and left in August 2010 for a job that paid more money. She stated that she did not quit working at the truck stop because she had to clean up after the two fireless activations. She worked the night shift and one of her duties was to clean the kitchen after closing. The staff cleaned the grill, swept and mopped, cleaned up dishes, and made sure there was no grease in the kitchen and no food residue on the floor. She stated that they cleaned the metal baffles above the vent hood twice a month. She saw Mr. Scoggin in July 2010 when he came to perform an inspection of the System and next saw him a few weeks later when the first fireless activation occurred. When that activation occurred, foam sprayed into the fryers and on the grill, and they had to close the kitchen to clean up the mess. She stated that, after Mr. Scoggin left, it was her understanding that the System was operational and that they could use the cooktop. The next time she saw Mr. Scoggin was when the second fireless activation occurred in August 2010. She was cooking in the kitchen when the System activated, and another employee notified Ark La Tex. She stated that Mr. Scoggin arrived and told her that he had to order a part for the System and would return the next day. He told her that they should not leave the kitchen unattended, but that they could resume cooking. She described him as being in a bad mood and seemed aggravated and in a hurry. She noted that she was not aggravated with needing to clean up the mess for a second time, but was not excited about it. She testified that she did not know how the System worked and that she never did anything to deactivate it. On cross-examination and after reviewing her deposition, she stated that Mr. Scoggin told her that he was going to turn off the System until the part he ordered came in and that she told Ms. King that the System had been turned off. She did not know if Mr. Scoggin returned to replace the part.
Brenda Stephens testified that she is currently employed at the truck stop and that, in July and August 2010, she worked in the restaurant as a waitress during the day shift. She met Mr. Scoggin when he came in to check the System. She recalled the System activating twice in the summer of 2010 and that she helped with the clean up each time. She noted that, when Mr. *1120 Scoggin arrived after the second activation, he was not happy to be called to the truck stop at 9:00 p.m. She admitted that she was aggravated she had to clean up again because of the fireless activation. She testified that she had no knowledge of how the System operates and that she never did anything to deactivate it.
Buford Wright testified that he repaired things at the truck stop when needed, but had no experience with the System. He stated that, after the August 2010 fireless activation, he observed Mr. Scoggin work on the System so he might have an understanding of how it works. They did not discuss what Mr. Scoggin was doing to the System, but, when he was finished, Mr. Scoggin stated that it was working. He later testified that he could not remember if an employee or Mr. Scoggin told him that they were "up and running" and could resume cooking. He recalled that Mr. Scoggin told him that he did not have a cylinder for the System, but would return the next day to install one. He testified that he never did anything to deactivate the System and would not have known how to do so.
The jury viewed a video of the fire. The depositions of three witnesses taken during litigation between Logansport and Scottsdale were read to the jury.
In his deposition, Ted Kaplon testified that he is a professional engineer hired by Scottsdale to determine the cause and origin of the fire. He performed a physical inspection of the truck stop on February 11, 2011, and noted that it did not appear that the System above the cooktop had activated. A tag on the System stated that it was last inspected by Ark La Tex in July 2010. His inspection of the System revealed that a fused link inside the exhaust hood had melted. He stated that, under normal circumstances of a properly operating System, the melting of the fuse link would have detected the fire, causing the System to activate and suppress the fire. His inspection of the area below the cooktop revealed some direct fire damage consistent with grease buildup, but he had no way of knowing how much grease buildup would have been there because it would have been consumed by the fire. He saw no evidence to indicate that the fire was intentionally set, but that actions of an individual were the cause of the fire in that the person turned on the cooktop and left it unattended. Photographs attached to his report show that the cover to the System's control box had been removed prior to his inspection.
In his deposition, Michael DeHarde testified that he is a professional engineer and was retained to examine the System and determine why it did not suppress the fire. He conducted his inspection on February 23, 2011. He noted that all spray nozzles for the System were present; the fusible links melted and parted; the control box cover was removed; the control box's discharge lever was in a nonactivated position; and, had the System operated, the lever would have moved to the activated position. He stated that this indicated that the cable failed to function properly. He stated that the cooktop, stove deep-fat fryers and the cooktop exhaust hood were protected with nozzles at the appropriate locations. There was no CO2 cylinder in the control box and no shadowing effect of the soot to indicate that a CO2 cylinder had been present during the fire. A sticker on the System indicated that it had been inspected by Ark La Tex in July 2010. He stated that the System was to be inspected bi-annually and maintained in accordance with the NFPA. He opined that the System failed to operate due to lack of proper maintenance. The detection cable and pulleys were not kept clean to allow proper movement and the CO2 cylinder was not installed in the control box.
*1121 In his deposition, Scott Howell testified that he is a mechanical engineer and was retained to determine if the System had activated and if it was in such a condition that it could have performed its job properly. He stated that there are three parts of the System-the detection circuit, the extinguishing piping and the extinguishing tanks and control hood. He further stated that, when the links melt, tension is taken off of the cable, which releases the spring that snaps the lever. The lever punctures a CO2 cartridge, which causes the extinguishing liquid to come up into the suppression piping. From the suppression piping, it goes through nozzles and the nozzles are aimed onto the cooktop so that suppression material smothers the fire. Once the System is activated, it is designed to turn off the gas or electricity to the cooking unit, as required by the NFPA. He opined that the System did not function because the detection circuit did not allow the control head lever to move and puncture the CO2 cartridge, and the second CO2 cartridge was missing. He did not review the conduit or the pulleys and was not able to form an opinion as to why the System did not function. He stated that it is normal for grease to build up in the hood and duct system between cleanings and that the buildup of grease should not prevent the System from operating. He opined that grease could build up enough to prevent a cable from traveling through the conduit to activate the System. He further opined that the cable did not move through the conduit, but he could not say why. He stated that he did not think monthly inspections would indicate whether there was grease buildup in the conduit. He noted that it is the owner's responsibility to make sure that all maintenance is performed by licensed technicians, but that it is not the owner's responsibility to make sure that the CO2 cartridge is present.
On cross-examination, Mr. Scoggin testified that he had owned Ark La Tex for 22 years and had a license for fire suppression systems. He stated that the System is designed to put out fires and protect various areas under the vent hood. There are nozzles for specific locations, e.g., over the grill, over the fryer, behind the baffles and in the exhaust duct. When the System activates, fire suppressant chemicals come out of the agent tank and through the nozzles. The time from activation until it stops is six to eight seconds. He noted that the NFPA requires fire suppression systems to be inspected on a bi-annual basis and that he conducted these inspections on the System when Logansport called him to do so. He did not recall having a written contract with Logansport and did not believe he was under contract to go to the truck stop to inspect the System without Mr. Miletello or a representative of his company calling him. He did not recall ever calling Logansport to say that it was time to inspect the System. He detailed what actions he took when conducting the inspection of the System. He testified that, after he installed it in 2000, he did not tell anyone at Logansport that they needed to do monthly inspections, but he did leave an owner's manual as required by the NFPA and by the manufacturer. He recalled that he performed bi-annual inspections from 2000 to 2005, that there was a fireless activation in 2005 and that he recharged the System after this occurrence. He stated that he continued to do inspections from 2005 and 2010 and recalled no instances during this time that he went to Logansport for any reason other than conducting the inspections. He testified that, after he conducted an inspection in July 2010, he was called to service the System due to a fireless activation, so he recharged the System. Several weeks later, he was called again for a second fireless activation. He stated that he was not *1122 aggravated to be called to the truck stop, but admitted that there is no convenient time for the need for service to occur. He testified that he did not tell anyone that he needed to order a part. He stated that he removed the CO2 cylinders from the System and put a spare cylinder in. The next time he performed an inspection, he put back in the cylinders he had removed. He further stated that he never performed another inspection after August 2010 because it was not time to do so before the fire occurred in January 2011. He believed Mr. Wright and Ms. Braxton were mistaken when they said that he had to order a part and would return the next day to install it. He agreed that the expert reports stated that there was no CO2 cartridge in the System and opined that someone removed it. He stated that, during his career, he had never left a system inoperable, but explained that, if he had to do so to order a part, he would have tagged it as inoperable and told employees not to use the cooktop. He testified that he was notified of the January 2011 fire a week to ten days afterward when someone from Cochran Construction called Ark La Tex asking for a quote on a new system. He explained how grease buildup in the conduit could have prevented the System from activating. He noted that, when he installed the System, Logansport used electric fryers; but, at some point before July 2010, they changed from electric to gas fryers. He stated that the System activated because the flue gas melted the fusible links, which would not have happened if the fryers were electric. He further stated that grease buildup could have welded the cable to the conduit so that the System would not activate and that no one at Logansport would know of such a grease buildup without an inspection. He testified that the cable was free when he last inspected the System.
On direct examination, Mr. Scoggin's counsel displayed a visual of a fire suppression system, and Mr. Scoggin described its components to the jury. Counsel also showed the jury and Mr. Scoggin a photograph of the kitchen, and Mr. Scoggin described the placement of the components. He then demonstrated to the jury how he assembles a fusible link and explained how the System works. He noted that the ability of the System to properly operate depends on the ability of the cable to move. If something is clogging the conduit, the cable cannot move. He opined that the buildup of grease in the conduit prevented the System from working on January 31, 2011, and explained how grease could build up in the System. He also noted that, if a fire starts below the surface of the cooktop, the System will not activate because there are no fire detectors under the appliance. He stated that a manual fire extinguisher could be used for a fire that is below the cooktop. He discussed the fireless activations and explained that these occur when there is excessive heat in some part of the System that he did not install or maintain. He testified that a CO2 cartridge is something he always carries with him and that he could purchase one locally, so he would not need to order one. He further testified that, when he left the System after the August 2010 fireless activation, he believed that it was appropriately functional.
Kenneth Sewell testified that he is the vice-president of Cochran Construction and has worked on at least six projects for Mr. Miletello. He stated that Mr. Miletello called him after the January 2011 fire and asked him to assess the damage and estimate the cost of repairs. He estimated the cost of repairs to the restaurant was $708,266.69, the cost to repair the convenience store was $41,495.19 and the cost to repair the gaming room was approximately $85,000. He performed some demolition and then waited to hear from Mr. Miletello about his insurance claim. Mr. Miletello *1123 advised him that Scottsdale denied his claim and asked him to prepare some redesign options to reduce the price of the rebuild. He stated that Logansport and Cochran Construction entered into a contract on November 21, 2011, for the reconstruction of the restaurant in the amount of $462,700. He noted that this lower price was due to receiving permission from the fire marshal to grandfather in certain things, such as using fire walls and a fire door, rather than complying with the most recent code. He stated that they also saved significant money by moving the kitchen and noted that the cost of the finished project was less than the estimate.
William Kostelka, CPA, testified that he began preparing Mr. Miletello's personal and business taxes in 2007. He discussed the truck stop's profits from the three years preceding the fire and the three years after the fire and calculated that net profits decreased by a total of $404,000 in the three years after the fire.
Mr. Miletello testified that he purchased the truck stop in 1998 and recently sold it. He discussed the video poker and gaming industry and noted that it is highly regulated by the State. He stated that the truck stop was his main source of revenue and that its location near the Texas-Louisiana border made the gaming venture very profitable. He noted that having a restaurant in a truck stop is a requirement when there is a gaming room. He stated that he purchased the System in February 2000 as part of the truck stop rebuild and verbally contracted with Mr. Scoggin to install it and inspect it according to State requirements. Mr. Scoggin conducted these inspections from 2000 to August 2010. Mr. Miletello did not believe that any of his employees called Mr. Scoggin to ask him to inspect the System. He recalled the two fireless activations in the summer of 2010. He was not present for these occurrences, but the managers notified him of the activations. He stated that, after the first activation, his employees notified him that Mr. Scoggin had been there and that everything was up and running. After the second fireless activation, he asked Mr. Wright to go to the truck stop, who reported back that they were up and running. He stated that, between August 2010 and the January 2011 fire, no one told him that the System was inoperable or that a part was missing. He testified that, when the fire occurred on January 31, 2011, he was not present at the truck stop and Mr. Yates called to notify him of the fire. He then went to the truck stop and learned that Ms. King's mother saw a fire around the cooktop and called in customers, and they started throwing flour on the fire in an attempt to extinguish it. He learned that the System had not activated when the State inspectors and insurance adjusters examined it after the fire. He stated that he was concerned with the restaurant being closed because that would warrant notifying the State Police. When the restaurant was not reopened within 90 days, he filed for an extension and contacted the Attorney General's Office out of concern that he would lose his gaming license. He stated that he was fined $50,000 by the State Police for not reopening the restaurant in time, which he paid in lieu of losing his gaming license. He borrowed $500,000 and hired Cochran Construction to begin the restaurant rebuild. He was able to save money by making changes to the layout. He stated that, as part of the demolition of the restaurant, Cochran Construction hauled off the cooktop, vent hood and all other equipment. The restaurant did not reopen until 13 months after the fire. He testified that Scottsdale denied coverage due to the System not working, which was a requirement of the policy. He stated that he was asking the jury to award Logansport $505,059.40 for construction costs to Cochran Construction, $142,699.59 for additional *1124 expenses required to reopen the restaurant and $50,000 for the fine paid to the State Police. He also noted that he suffered decreased revenue in the gaming room while the restaurant was closed and in the years after the restaurant reopened.
The defense's witnesses then testified. William Cole, CPA, testified that he was requested by defense counsel to estimate the loss of income on the truck stop and restaurant. He estimated the loss for Logansport to be $99,978, which includes interest. He stated that it took three years after the fire for the income to return to its pre-fire level.
Edward Angel testified that he is a general contractor and was asked by defense counsel to inspect the truck stop and review the damage caused by the fire and the cost to make repairs. He calculated that the damage to the truck stop could be repaired for $227,000. He stated that this amount differs from the amount actually paid to rebuild because Mr. Miletello decided to undertake considerable and extensive renovations, which were more than just building the premises back to its original condition.
John Wlascinski testified that he is a forensic engineer and was asked by defense counsel to evaluate the System and determine why it failed to extinguish the fire. He stated that he attempted to recreate what he saw on the video of the fire, including its initiation, its location and how it spread. He noted that the fire started under the cook surface and the "only reasonable explanation beyond the gas that fueled the burners was an accumulation of grease or cooking products." In his recreation, he did not use the actual cooktop involved in the fire. He used grease, lard, bacon and other byproducts of cooking operations and put that material in the catch basins under the cooktop next to the burners and then turned the burners on. He noted that it ignited in a manner similar to what is seen in the video. He further stated that he was present in court for Mr. Scoggin's testimony about how the System functions and that he agreed with his testimony. He agreed that the System was not designed to extinguish a fire under the cooktop and such a fire will not activate the System, noting that a manual fire extinguisher would be the fastest means of extinguishing such a fire. He stated that, in the video, persons are seen throwing flour on the fire; which, he explained, the way they threw it in the air is flammable and even explosive. He further stated that the evidence shows that there was restriction in the movement of the cable in the System and that the clogging of the conduit occurred after August 2010. He also agreed with the testimony of Mr. DeHarde that the CO2 cartridge was not present in the System and that the evidence showed that the cover was not on the control box.
While deliberating, the jury sent a note to the trial court and asked it to define, when considering the fault of Ark La Tex, whether that meant the origin of the fire or the consequence of the fire. The court responded that it meant the consequence of the fire.
On March 24, 2016, the jury found that it was more likely than not that there was a verbal agreement between Logansport and Ark La Tex for bi-annual inspections and servicing of the System. It found that it was not more likely than not that Ark La Tex was at fault for the fire.
On March 30, 2016, the trial court filed a judgment in favor of Ark La Tex and Hallmark and against Logansport, dismissing the matter at Logansport's cost.
On April 11, 2016, Logansport filed a motion for judgment notwithstanding the verdict ("JNOV") and, alternatively, a motion for new trial. It contended that the jury verdict that Ark La Tex bore no *1125 responsibility and that Logansport was 100% at fault for the damages was clearly contrary to the law and the evidence and resulted in a total miscarriage of justice. It contended that a reasonable jury could not have determined that Ark La Tex was not responsible, to some degree, for the damages Logansport suffered as a result of the fire. It stated that, had the System, which was the responsibility of Ark La Tex, properly operated, Logansport would not have sustained any damages. It admitted that, had its employees correctly used the manual fire extinguisher, the fire would have been suppressed and it would not have suffered any damages. It stated that the jury should have considered the comparative fault of the parties and that it was inconceivable that the jury did not assign any percentage of fault to Ark La Tex.
On May 16, 2016, Ark La Tex filed a memorandum in opposition to Logansport's motion for JNOV and motion for new trial. It argued that, whether the failure of the System to operate was due to a missing CO2 cartridge or a clogged conduit, neither was the fault of Mr. Scoggin. It contended that the failure of the System to operate was due to the actions and/or inactions of either Logansport or a third party tasked with cleaning operations. It argued that the jury's verdict was based on sound analysis and was not contrary to the law and evidence. On May 23, 2016, Ark La Tex and Hallmark filed a response brief on JNOV and new trial issues.
On July 15, 2016, the trial court filed a ruling, stating:
This Court was surprised by the jury's verdict. This Court believes that plaintiffs proved more probably than not that the fire suppression system failed because of the defendant's actions and inactions. However, it was not unreasonable for the jury to interpret the evidence otherwise. Each critical element of the plaintiffs' case was addressed by the defendant with contradictory evidence.
The trial court noted the facts of the "perfect storm" and opined that, had the jury found some fault on behalf of Ark La Tex, there were many factors that could have been considered in the comparative fault analysis. However, it also determined that a rational juror could have found that Ark La Tex did leave the System in an operable state and that the System failed for reasons other than Ark La Tex's actions or inactions. Accordingly, the trial court denied Logansport's motion for JNOV. Regarding the motion for new trial, the trial court stated that it did not believe that any additional evidence could be presented to alter the current verdict and that there is no hint of jury misconduct. Therefore, the trial court denied Logansport's motion for new trial. On August 3, 2016, the trial court filed a judgment denying Logansport's motions for JNOV and new trial.
Logansport appeals the August 3, 2016 judgment.
DISCUSSION
Jury's Verdict
In its first assignment of error, Logansport argues that the verdict is manifestly erroneous because the jury failed to consider the nature of each party's wrongful conduct and the extent of the causal relationship between that conduct and the damages suffered. In its second assignment of error, it argues that the verdict is manifestly erroneous because it is contrary to the law and evidence. It contends that the doctrine of comparative fault applies to this case and that the System's failure to properly function was the cause-in-fact of the fire expanding and causing damage. It also contends that the jury erred in assessing it 100% of the fault for the damages and argues that at least 80% fault should be attributed to Ark La Tex. It states that *1126 a reasonable jury could not reach the conclusion that Ark La Tex did not bear some responsibility for the damages that resulted from the System's failure to function properly.
Ark La Tex emphasizes that the standard of review is manifest error and contends that it should prevail on appeal because Logansport's case is based solely on a contest between the testimonies of witnesses. It argues that Logansport's witnesses suffered from a lack of credibility and were impeached on cross-examination and that the jury accepted the testimony of Mr. Scoggin. It contends that the evidence clearly shows that nothing Mr. Scoggin did or did not do was the cause of or contributed to the fire.
It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO , 549 So.2d 840 (La. 1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id. If the jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Id.
The record in this case demonstrates that the jury was not manifestly erroneous or clearly wrong when it determined that Ark La Tex was not at fault for the January 31, 2011 fire. As noted by the trial court, each critical element of Logansport's case was addressed by Ark La Tex with contradictory evidence. The jury heard evidence that the System failed to activate on the day of the fire because a necessary CO2 cartridge was not present in the System's control box. Although Logansport witnesses testified that Mr. Scoggin told them that he needed to order a new CO2 cartridge after the August 2010 fireless discharge, Mr. Scoggin testified that he replaced the CO2 cartridge and suggested that someone tampered with the control box and removed the cartridge. The jury also heard evidence that the System failed to activate on the day of the fire because grease buildup in the conduit prevented a cable from moving. Mr. Scoggin testified that, when he last inspected the System in the summer of 2010, the cable freely moved. The jury also heard evidence that the fire ignited beneath the cooktop, which is an area the System is not designed to extinguish; that manual fire extinguishers present in the kitchen would have been the most expedient means of extinguishing the fire; and that use of flour by an employee and customers on the fire may have accelerated the fire.
The jury was presented with evidence that the System failed to activate on January 31, 2011, for reasons other than Ark La Tex's action or inaction. It clearly found Ark La Tex's witnesses to be credible and resolved conflicts in testimony in Ark La Tex's favor. The jury's finding that Ark La Tex was not at fault for the fire is reasonable in light of the record reviewed in its entirety.
Accordingly, this assignment of error lacks merit.
Damages
Logansport argues that, if this court on appeal determines that the jury's verdict was manifestly erroneous or clearly wrong, *1127 then a de novo review of quantum must be made to compensate Logansport for damages related to the fire. Pursuant to our determination that the jury's verdict was not manifestly erroneous, this argument lacks merit.
Motion for New Trial
In its third assignment of error, Logansport argues that the trial court erred in denying its motion for new trial. It differentiates the standard for a motion for new trial from that of a JNOV and notes that the standard for a motion for new trial is less stringent and allows the trial court to evaluate evidence and draw its own inferences and conclusions.
Ark La Tex argues that the trial court applied the correct standard and correctly recognized that Ark La Tex refuted each point raised by Logansport with competent contradictory evidence. Therefore, it argues that a JNOV was not appropriate and that a new trial would simply have given Logansport another bite at the apple.
Louisiana C.C.P. art. 1811 controls the use of JNOV, but does not specify the grounds on which a trial court may grant a JNOV. In Anderson v. New Orleans Pub. Serv., Inc. , 583 So.2d 829 (La. 1991), the Louisiana Supreme Court set forth the standard to be used to determine when a JNOV is proper. It stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. [ Scott v. Hosp. Serv. Dist. No. 1 of St. Charles Par. , 496 So.2d 270 (La. 1986).] In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
A motion for a new trial may be joined with a motion for JNOV, or a new trial may be prayed for in the alternative. La. C.C.P. art. 1811(A)(2). A new trial shall be granted when the verdict or judgment appears clearly contrary to the law and the evidence. La. C.C.P. art. 1972(1). A new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law. La. C.C.P. art. 1973. In Gibson v. Bossier City Gen. Hosp. , 594 So.2d 1332 (La. App. 2 Cir. 1991), this court noted:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact-finding is the province of the jury and a trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.
The facts and inferences in this record do not approach the "strong and overwhelming" standard of showing that reasonable *1128 persons could not have reached a verdict in Ark La Tex's favor. As discussed above, the jury was reasonable in reaching the verdict that Ark La Tex was not at fault for the fire. Therefore, the trial court did not err in denying Logansport's motion for JNOV. Further, the jury's verdict is not contrary to the law and evidence, and it is supportable by a fair interpretation of the evidence. Therefore, the trial court did not err in denying a new trial.
Accordingly, this assignment of error lacks merit.
CONCLUSION
For the forgoing reasons, the judgments in favor of Defendants-Appellees Ark La Tex Fire Systems, LLC, and Hallmark Specialty Insurance Company, and against Plaintiffs-Appellants Logansport Gaming, L.L.C., Logansport Truckstop, L.L.C., and Logansport Gaming, L.L.C., d/b/a Sabine River Restaurant, are affirmed. Costs of this appeal are assessed to Logansport.
AFFIRMED.

In its petition, Logansport named Ark La Tex's unknown insurer as "ABC Insurance Company." During discovery, Logansport determined the identity of the insurer to be Hallmark and filed an amended petition to name Hallmark as a defendant.

Logansport stated that the property and casualty insurance policy with Scottsdale required Logansport to maintain the System in complete working order. As a result of the System's failure to activate, Scottsdale denied coverage and filed suit for a declaratory judgment in the United States District Court for the Western District of Louisiana, alleging that the System was not maintained in complete working order. The Western District granted Scottsdale's judgment, declared that the System was not maintained in complete working order and denied insurance coverage to Logansport.